## UNITED STATES v. MOTION PICTURE PATENTS CO. et al.

(District Court, E. D. Pennsylvania. October 1, 1915.)

No. 889.

1. COPYRIGHTS ☜65—COPYRIGHT LAWS—SCOPE.
   Copyrights of dramatizations cover photo-play presentations of the same subject.
   [Ed. Note.—For other cases, see Copyrights, Cent. Dig. § 62; Dec. Dig. ☜65.]

2. COMMERCE ☜15—MONOPOLIES ☜12—INTERSTATE COMMERCE—SUBJECTS OF.
   Photo-play films, shipped from one state to another, are subjects of interstate commerce, and fall within the scope of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209, prohibiting unreasonable and undue restraint of trade and commerce.
   [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 17, 34, 35; Dec. Dig. ☜15; Monopolies, Dec. Dig. ☜12.]

3. MONOPOLIES ☜1—PATENT LAWS—ANTI-TRUST ACT.
   The patent laws, which preserve to a patentee the exclusive right for a limited time of making and vending the patented article, are not repealed by Anti-Trust Act July 2, 1890, and the patentee by virtue of his patent may impose reasonable conditions of bailment or sale.
   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 1; Dec. Dig. ☜1.]

4. MONOPOLIES ☜29—ANTI-TRUST ACT—"CONSPIRACY."
   Under Anti-Trust Act July 2, 1890, which denounced unreasonable competition and conspiracies, a "conspiracy" may have as an element the seeking of an unlawful end or the employment of unlawful means, and the good motives of the conspirators are no defense.
   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 19; Dec. Dig. ☜29.
   For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

5. MONOPOLIES ☜12—RIGHTS OF PATENTEES.
   The owner of a patented device may acquire any other patents for improvements, or several owners may pool their ownerships for their joint protection; but such patents cannot be acquired or combined for the purpose of unlawful restraining of trade.
   [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ☜12.]

6. MONOPOLIES ⬡⟺12—WHAT CONSTITUTE—DEFENSES.

> Motion picture producers and importers, some of whom had patents upon articles, such as the positive films, cameras, and projecting machines, formed a combination to regulate the trade. They created a board to censor films, and established exchanges, refusing to sell films to operators of theaters who did not belong to their exchanges, and who did not pay royalties on their machines to the combination, regardless of when or from whom they were purchased. The restrictions were attempted to be justified as a protection of the patent rights of the parties to the combination. *Held*, that such combination was invalid, as a violation of Anti-Trust Act July 2, 1890.

> [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. ⬡⟺12.]

In Equity. Petition by the United States against the Motion Picture Patents Company and others to restrain defendants as a monopoly. Decree for petitioner.

T. W. Gregory, Atty. Gen., G. Carroll Todd, Asst. Atty. Gen., Edwin P. Grosvenor, Sp. Asst. Atty. Gen., and Francis Fisher Kane, U. S. Atty., of Philadelphia, Pa., for the United States.

J. H. Caldwell, of New York City, and Charles K. Zug and John G. Johnson, both of Philadelphia, Pa., for defendants General Film Co., Thomas A. Edison, Inc., Frank L. Dyer, William Pelzer, Melies Mfg. Co., Pathe Frères, Kalem Co., Gaston Melies, J. A. Berst, and Samuel Long.

James J. Allen, of New York City, for defendants Vitagraph Co. and A. E. Smith.

David J. Myers, of Philadelphia, Pa., and George R. Willis, Luther M. R. Willis, and Frederick R. Williams, all of Baltimore, Md., for defendants Armot Moving Picture Co., Harry N. Marvin, Jeremiah J. Kennedy, Biograph Co., and Motion Picture Patents Co.

R. O. Moon, of Philadelphia, Pa., for defendant Siegmund Lubin.

Charles Biddle, of Philadelphia, Pa., and Henry Melville, of New York City, for defendants Essanay Film Mfg. Co., George Kleine, Selig Polyscope Co., George K. Spoor, and W. N. Selig.

Charles F. Kingsley, of New York City (Melville Church, of Washington, D. C., of counsel), for all defendants.

DICKINSON, District Judge. A petition was filed in this case under the act of July 2, 1890, averring the combination of the defendants to accomplish an unlawful restraint of trade, and consequent obstruction of the free flow of commerce in interstate transactions, in the sale of positive motion picture films and other necessary accessories of the motion picture art. The prayer is that a stop be put, by the power of the law, to the practices charged to be illegal.

The record is of such bulk, and the discussion has taken such a wide range, and has with such thoroughness dealt with all possible phases of the case, that to even outline, with anything like adequacy, all the considerations involved in its decision, would extend an opinion beyond manageable limits. The present discussion is therefore limited to two questions (and largely to one of these) which give us the bearing points upon which the whole case turns. This restriction

does not imply the slighting of any feature of the arguments, so well worthy of the fullest attention, which have been addressed to us, because there is substantial accord in the thought that, with these questions eliminated, the defense has failed. This feature will, however, be adverted to later.

At the risk of being open to the criticism of its being wholly academic, a start may be made with a few general observations. The beginnings of this controversy are found in the ages-long struggle "to secure the blessings of liberty," to obtain which is stated to be one of the objects of our Constitution. There is deep-grained in human nature the impulse to influence, and, so far as it can be done, control, the actions of others. It is too much to expect that this control, when secured, will always be exerted for altruistic ends. Out of this condition has arisen the need of a power of government to check the restraints which the strong would otherwise impose upon those whom they could control. Power and efficiency, however, are possessed in insensible gradation, and there is a right to the liberty of its full, fair exercise. There would be no real gain in securing to some freedom from extralegal control, by imposing upon all unfair and unreasonable restraint, through an unfair and unwise administration of the law.

The liberty spoken of in our Constitution had more direct reference to this latter freedom from the "undue and unreasonable" exactions of constituted rulers. In the cycle of human effort, we have come back to the needs which moved men into constituting rulers over themselves, and the power of the law has been invoked for protection against what are declared to be evil practices. The particular phase of liberty with which this law concerns itself is the freedom or free flow of commerce. It is based upon the right of every individual to choose his own calling in life, and to follow the trade of his choice unhampered by any undue and unfair interference from others. It secures this "blessing of liberty" to all by making it unlawful for any to conspire to bring about "restraint of trade or commerce." This is the genesis and motive of the act of July 2, 1890. It seeks (within constitutional limitations) to reach this end by declaring all such conspiracies to be criminal, and places under the ban of its condemnation all such attempts "to monopolize any part of trade or commerce." Its meaning has been declared in as broad and clean a sweep of language as could well be employed, and has been interpreted for us in a series of opinions which render further comment worse than vain. There are now more than a round dozen of these decisions, in which can be found the rule to be applied to the facts of the instant case.

[1, 2] The full text of the complaint appears in the record and is too lengthy for quotation. The gravamen of the offense may be gathered from the general summary that it is a conspiracy to drive from the field all other traders in the things which make possible the practice of the motion picture art, and to monopolize to themselves that trade, and through this the practice of the art itself. This latter feature justifies the interpolation into the discussion of a preliminary question which lies at the threshold of the proceedings. The defense asserts the real charge to be that of an effort to control the motion picture business. This is asserted to be the business of dramatic rep-

resentation, and dramatic representation to be the practice of an art. The control, with the seeking of which the defendants are charged, is therefore the control of an art, and not of trade, or of anything which is the subject of commerce, or can be brought within the laws relating thereto.

It has been settled by the decisions, under the earlier copyright laws, that the copyright of a dramatization covered a photo-play presentation of the same subject. This was based upon the recognition of, what every observer experiences, the similitude, if not identity, of the impressions received from seeing a photo-play and from the same play acted out by actors living and moving before his eyes. The photo-play business may therefore be well said to bear the same relation to dramatic art which the theatrical business does. The latter has not, however, the same relation to trade and commerce. The moving picture business, as an entirety, is made up of the presentations, to which the public is invited, and of a trade in other things, which make this final display possible. If it is a photo-play, it has, of course, the same basis of the labors of the author and the art of the actor as has the acted play. The spectator of the play sees the actors acting out the play. That which the spectator of the photo-play thinks he sees is an illusion. He thinks he sees, for instance, a man moving (or a picture of it), and in one sense he does, because such is his mental impression of what is before him. This illusion is produced by projecting upon a screen, in rapid succession, enlarged reproductions of a series of consecutively quickly taken photographs of a man as he is moving. There must be, therefore, in the motion picture business the use of all these additional accessories, from the screen back to the raw film and the camera, as part of the apparatus for the production of a photo-play.

One of these essential things in the motion picture business is the positive motion picture film or reel, and the charge made against these defendants is that, whatever may have been their final purpose with respect to the control of the art, what they combined to do, and have done, is to restrain trade or commerce in these films, which are articles of trade and the subject of large interstate transactions, in which the defendants had part. The latter fact is admitted. It is evident that whoever controls the films referred to controls the motion picture business, but the point with which we are now concerned is that interstate trade in these films is within the statute.

[9-0] The next branch of the defense which presents itself for analysis and discussion is that based upon the patent rights of the Motion Picture Patents Company. The plea is, in legal effect and in practical acknowledgment, one in confession and avoidance, for there is, as already stated, a substantial (although not formal) admission that, with this patent right ownership out of the case, plaintiff should have the relief prayed.

The importance of the question thus raised cannot well be overestimated. The eulogy which counsel have bestowed upon our patent law system springs from real feeling, and is not only a beautiful, but doubtless a deserved, tribute to its merits, and their eloquent portrayal of the benefits which have flowed from it is as true as it is impressive.

It is easy to keep in sympathetic touch with them in the first step in their argument, and to accept the proposition that the Anti-Trust Act did not work a repeal of the patent laws. This must be accepted on general principles, even were its supports not buttressed by the cases to which we have been referred. That their validity is not open to question in a collateral proceeding, and is to be assumed in this inquiry, must also be conceded. Prima facie they are and must be taken to be valid, and to be for what the claims allowed by the Patent Office show.

A little space may now be devoted to the consideration of what a patent right is, in order that we may understand the true value of this part of the defense. As has been well said, the patent laws do not confer any right to make, use, or vend the subject-matter of an invention. This is the natural right of the inventor. What the patent law does do, for one thing, is to take away, for a limited time, from all others than the patentee, or his assigns, that which would otherwise have belonged to them also—the right to make, use, or vend the patented article. Another thing it does is to proffer to the patentee the aid of the law in enforcing this prohibition upon others. The latter is really the right given. It is the right to a remedy. It is, as it is sometimes phrased, a proprietary right. There is also the idea of property of a special kind, which has all the general characteristics of other kinds of property. The ownership of a patent, as the ownership of any form of property, may confer a power upon the proprietor which he otherwise might not have been able to wield. It has its peculiarities, as other kinds of property have, and certain consequences flow from this. To one of these we will later refer, but the point now presented is that a patent as property must have the same relations to the act of 1890 as would any other kind of property. In view of this, it is a little difficult to grasp the thought that, in this broad aspect, patents are not subjected to the provisions of this act, just as is any other species of property. We see no escape from the conclusion that they are. Just here, however, comes in a difference born of one of the peculiarities to which reference was made.

The act of 1890, in its first section (Comp. St. 1913, § 8820), declares combinations in restraint of trade to be illegal. By its second section it condemns monopoly. The opinions in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, Keystone Watch Co. v. United States (D. C.) 218 Fed. 502, and in Patterson v. United States, 222 Fed. 599, —— C. C. A. ——, make clear the purpose and scope of the two sections. The condemnation is visited both upon the means and the end, forbidden by law. A peculiarity of the rights of the owner of a patent, as distinguished from other property, is this: Each has the right to sell that which is his, but the owner of the patent has the exclusive right to sell his patented article. This is, in a very substantial sense, a monopoly. It must be, however, that the monopoly here meant is not the monopoly condemned by the act of 1890. To hold otherwise would clearly be, as counsel for defendants urge, a logical absurdity, because there can be no such thing as restraint in a trade which has no existence, and a monopoly created by law, in pursuance

of a policy of the law, cannot be said to result from such restraint. To transfer a phrase from the opinion of Judge Cochran, in Patterson v. United States, which was directed to something else, but which is applicable here:

"There can be no monopolizing in the legal and accurate sense of the word where there can be no common occupation."

The right to sell carries with it the right to withhold from sale, or to part with the possession without parting with the ownership. It also confers the right to impose reasonable and legal conditions of bailment or sale "restricting the terms upon which the [patented] article may be used and the price to be demanded therefor." All these propositions are clear, and have been expressly held to be the law. Bement v. National Co., 186 U. S. 70 and 72, 22 Sup. Ct. 747, 46 L. Ed. 1058; and Standard Co. v. United States, 226 U. S. 20, 40, 33 Sup. Ct. 9, 57 L. Ed. 107. The limitation that the terms must be legal should, however, not be lost sight of. An effort, for instance, after a sale, to impose a sale price condition, which will follow the article through successive sales, will not be upheld.

We have, therefore, to determine the limits of a right and a wrong which seem to overlap each other. It is the right of a patentee, through having the exclusive sale of the patented article, to control, and in that sense, to monopolize, the trade in it. It is wrong by any illegal restraint of trade to monopolize it, or any part of it. On the one hand, it cannot have been intended to make it unlawful to acquire that the right to which the law has conferred. On the other hand (as already observed), it cannot be that the grant of a patent right confers a license to do that which the law condemns.

The solution of the problem is to be sought by finding the special field of operation of each of these laws. There is a field of trade, the sole occupancy of which may be in a patentee. Here he is supreme, and the keeper of the gate of entrance. There is another field which is in the common occupancy of all. Where the law has given the whole field to a patentee, with the express right of exclusion of others, and the use of the power of the law to enforce the exclusion, it is unthinkable that such exclusion is an illegal restraint of trade. Where the field, however, is open to all, competition for trade is likened to a race in which all may enter, but in which there must be no unfair jostling or hampering of others. Each one is free to exert all his powers, and distance, if he can, all competitors, and win all the prizes; but he must run fairly and accord to others a like freedom. If he possesses a patented device which will aid him in the race, he may use it, as he may use any other form of property; but he must put it only to its proper use, and if he uses it as a weapon to disable a rival contestant, or to drive him from the field, he cannot justify such use, because of his patent right, except to the extent of protecting his exclusive right. We have, therefore, the principle, which is recognized in all the cases, that if the subject-matter of a contract, which otherwise would be illegal because in restraint of trade, is a patented article, this takes away the illegality only to the extent to which the field of the trade, controlled through the combination, is coextensive with

the field within which exclusive control has been granted by the law. This is the doctrine of Henry v. Dick, 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880, Bement v. Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, the Bath Tub Case, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107, and all the other kindred cases to which we have been referred.

The difference between this private field and the common field of trade is, as a distinction, sufficiently clear; but there may be again an overlapping. The owner of a patented article has the right to enter upon this common field of trade. His patented article may be so superior, or of such less cost than anything else upon the market, as to supplant all others and give to him the whole trade as effectually as if his patented article has originally had the field to itself. Indeed, its ownership may be sought, for the reason that it has this possibility of power. Again, the patent may apply to only certain features of the article of trade, and yet enable the owner to reap the same advantage, and control a trade in what is beyond the exclusive rights given by the patent. The special circumstances affecting a particular contract or combination may make the principle difficult of application, and the line of legality or illegality hard to draw; but the principle remains the same. The legality of such a contract is determined by the judgment of whether, in its whole scope and legal intendment, it is fairly limited in its operation to the proper field of trade belonging to the patentee, and whether any further advantages which flow to him are fairly incidental, and are not the evil fruit of unfair practices employed to restrain the right of others to a share of the common trade. It is the legal intendment of the contract or combination which is to be found. The motives of the contracting parties, whether innocent or otherwise, do not determine the real character of their act; but it is determined through the judgment of the law. Motives and intentions, except as declared, or appearing from the character of the act, are too vague and difficult of ascertainment to be made the basis of the legal judgment called for in such cases. A conspiracy under this statute, as at common law, may have, as an element, the seeking of an unlawful end or the employment of unlawful means.

We learn from the opinion in the Keystone Watch Case Co. Case that the prohibited restraint of trade, beside being undue and unreasonable, must be the direct, and not a merely incidental, result of the contract or combination, before the latter will be condemned as illegal. If it is asked to be condemned, not because of the illegality of the means employed to accomplish its end, but because monopoly results as a consequence, the monopoly must be shown to be an unlawful monopoly, not the monopoly granted by the patent laws. A contract or agreement among business men, which had as its end to preserve to the owners of a patent the exclusive sale of the patented article, and as its means the exercise of due, reasonable, and fairly proper control over sales to be made, would not be condemned as void in itself, or justify any inference of guilt under the act of 1890. Where, however, by what was agreed to be done, the end indicated, in the sense of the result to be expected, was a monopolistic control of what was not the exclusive property of any one, or such a monopoly was

the direct result of undue and unreasonable restraints of trade, to be employed as the means of carrying out what was to be done, the fact that any one or more of the persons concerned owned patents would not prevent a finding of conspiracy.

A feature of the Watch Case Co. litigation affords us an illustration of the extent to which patent rights enter into the defense to proceedings of this character. The feature alluded to was, in the language of the opinion, that of—

"the system under which the Howard watch was sold by defendants. Certain * * * parts of the Howard watch were covered by bona fide patents taken out and used for a lawful purpose, and as the owner of these patents the company had the right to make a direct agreement with the jobbers, whereby a minimum price was fixed at which the jobber might sell. * * * The company went further, however, and by mere notice to the retailer, accompanying the box in which the watch was sold by the jobber, attempted to fix the minimum price at which the retailer might sell to the consumer. * * * When the company sold the watch to the jobber, it had fully exercised its right to vend, and had no right to use the notice subsequently given in order to control the price at which the retailer might sell."

As a conclusion to the whole discussion, we deem the Bath Tub Case to be decisive of the principle contended for by the United States. There, it is true, the patent was not on the ware, which was the subject of the trade sought to be monopolized, but on a tool used in its manufacture, and the case doubtless might have been ruled upon that distinction. We cannot accept, as well taken, the position that it was so ruled, because the court, in formulating a statement of the principle upon which the ruling was based, expressly refused to plant the decision on this narrow ground, but placed it upon the broad principle that the agreements in that case—

"transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law. * * * The agreements * * * combined the manufacturers and jobbers, * * * which combination was condemned by this court as offending the Sherman law. The added element of the patent * * * cannot confer immunity from a like condemnation; * * * and this we say without entering into the consideration of the distinction of rights for which the government contends between a patented article and a patented tool used in the manufacture of an unpatented article. Rights conferred by patents are indeed very definite and extensive, but they do not give, any more than other rights, an universal license against positive prohibitions. The Sherman law is a limitation of rights, * * * which may be pushed to evil consequences. * * *"

We would feel constrained, on the authority of this case alone, to find that the agreements and acts of the defendants in the present case went far beyond what was necessary to protect the use of the patents or the monopoly which went with them, and that the end and result, which would be expected to be and was accomplished, was the restraint of trade condemned by law. Some of the considerations which move to this conclusion are stated later.

This is a lengthy prelude to the consideration of the special facts of this case. We feel relieved from the necessity of any extended reference to them, because they are set forth in the complaining petition with a precision and accuracy which has prevented denial, except

as to the motives which actuated the defendants and the legality of the monopoly. With respect to the motives and conscious purposes by which men are actuated, it has been well said that these "cannot be easily estimated," and we may concede to the defendants no purpose to offend against or to evade the law, and that their intentions were as beneficent and have resulted in as much good to the patronage of the art as is claimed, and that this good bears a fair relation to the profits received by them. This is foreign to the inquiry which we have made, because the duty to refrain from what is prohibited by law "cannot be evaded by good motives." Moreover, "the law is its own measure of right and wrong," as well as the judge of whether a transaction is of the character which it condemns. If, in the judgment of the law, a contract or co-operating agreement is such as to work an undue and unreasonable restraint of trade, and through such restraint to monopolize trade or any part of it, the judgment is one of condemnation, no matter how innocent or otherwise praiseworthy the motives of those who had part in it.

We do not, therefore, feel called upon to make any specific findings on this subject beyond what is stated to be found. The real motives of those whose minds conceived and whose wills carried through this combination were doubtless like those behind almost all other human acts, probably of a mixed character. We would not be justified, and would certainly have no wish, to deny the presence of the very laudable motives which defendants avow in their answer, some of which were to gratify their desire to allay bickerings and recriminations among themselves, to advance and improve the art, to protect the morals of the public, and, as they frankly admit, to make money for themselves. Certain it is that the end and purpose of the plan was to dominate and control the trade in all the accessories of the art, and, in order to assure this, to control the entire motion picture business. We are driven to this conclusion, not only because that is the plain meaning of what they did, but also because they themselves categorically declare the latter to be the imperative need of the business, and one which they alone could supply. The need was for a single directing and regulating head. This extended even to a censorship of what was shown. The United States could not, and the states would not, interpose for the purpose of regulation, and the defendants claim the credit of having performed this neglected duty of the state. In doing all which was done, the defendants not merely deny the illegality of either end or means, but also lay claim to commendation. We only mention this to make clear the fact that they did monopolize, and the only question left is whether this monopoly is a lawful monopoly, or was accomplished through an unlawful restraint of trade.

The combination was not formed until 1908. The defendants were at that time engaged in the business as manufacturers or importers. There were scores of jobbers buying and distributing films and necessary supplies to thousands of exhibitors. The business was expanding, literally by leaps and bounds. The total investment ran into millions. There was therefore a trade to be restrained, and one well worth monopolizing. The original plan, if it was contemplated, did

not disclose any purpose to exclude the middlemen, and, from its first being put in operation, 116 jobbers were licensed by and did business with the defendants. Within a short time, however, the absorption of this part of the trade was decided upon, and the General Film Company was formed to take over the business of distribution. How effective and thorough were the methods employed is shown by the fact that, of the 116, there is left one solitary survivor.

The plan out of which these methods grew was first to combine the defendants, who were manufacturers and importers of films, in an agreement to act as one man might have acted. Lists of exchanges and of theaters were prepared, and no exchange was permitted to have films, and no theater to exhibit them, unless with the consent of all of the defendants. The names of none appeared upon this list except such as bought all supplies from the defendants, and any who dealt otherwise were dropped. Every theater was required to pay a royalty for the use of a projecting machine, even when the machine had been owned by the exhibitor before the combination was formed. The films passed into the possession of exchanges and exhibitors under an agreement which enabled the defendants to recall them at will. It is too clear for comment that the mere possession of the power here shown would make its assertion seldom necessary. It was, however, effectively exercised.

It is also clear that such a combination is condemned by the act of 1890, unless immunity is given by the patent laws. The pressure here is upon the weak point of the argument on behalf of the defendants. The fault in it is basic. There is doubtless injustice in applying, even rhetorically, the "dead Indian" aphorism to trusts. It may be admitted that there may be trusts which are both living and good. When a monopoly has been found, however, to be the result of an unlawful restraint of trade, the argument that the combination through which it has been accomplished is a good trust, or was formed from good motives, or that good results from the monopoly, is for legislative, and not judicial, consideration. As already stated, it is the legal intendment of the whole scheme, which determines its character, what is its end, and what the means to be employed, to be found from the natural and to be expected results. Here, again, the illuminating phrase employed in the Keystone Watch Co. opinion clarifies the thought. If the end is monopoly, and the means the restraint of trade, the inquiry is directed to the character of the restraint. If that is undue and unreasonable, and was directly intended, and the monopolistic result flows as a direct, and not a merely incidental consequence, the combination through which it is brought about is illegal. The same conclusion follows a finding that the end is illegal, because reached through the same means. Indeed, the two things come to be, nearly, if not quite, the same, although there is room for a difference.

The defendants had the right to propose to themselves, as an end, the protection of their exclusive right to sell an article, protected by a patent, which was their property. They had the right to employ, as a means to this end, due and reasonable regulations, and to impose any lawful conditions of sale. If restraint of trade and monopoly flowing from it incidentally resulted as a consequence, as neither the

end proposed nor the means employed was unlawful, the combination which effected these objects could not justly be condemned.

The owner of a patented device, process, or product may undoubtedly acquire from another any issued patents for improvements, and we see no reason to deny the right of the owners of the original patent, and of the patented improvements, to pool their ownerships for their joint or common protection. This we understand to have been expressly ruled. United States v. United Shoe Co. (D. C.) 222 Fed. 349. Indeed, this case may well be claimed as authority for the proposition (within its facts) that there might be a combination of the owners of different patented machines all entering into a manufacturing trade. However this may be, the distinction sought to be pointed out is that while the owner of a patent on a plow, covering the handles or beam, might acquire or join with the owners of patents covering the moldboard, or share, or other parts of the plow, for the protection of the patented rights of all, and thereby incidentally secure an enlarged part of the trade in plows, the judgment would refuse to sanction a combination between the owners of patented plows, patented harrows, patented reapers and binders, and other implements of husbandry, and large dealers in these implements, who were not owners of patents, for the purpose of monopolizing the whole trade in the products of agriculture, if, the direct end first proposed was to unduly and unreasonably restrain trade, as a means to the final purpose of monopolizing. The ownership of the patents, in such a case, surely could not be accepted as a defense to the charge of unlawful combination.

If a reason to support the distinction between these supposititious cases is asked for, it may be found in the fact that, in the first case, it could not be concluded that the scheme of the combination had no normal and real relation to the protection of the patent rights; in the second case, no such relation could be even plausibly said to exist, and its assertion would be characterized as a pretense.

The legal justification, set up by the defendants, for what they have done, and for everything they have done, is that in so doing they were lawfully asserting rights acquired by them through a large number of overlapping patents. The total number reaches sixteen. Ten of these are admittedly, however, of minor importance, and, indeed, of no importance, in their bearing upon the case. The remaining six may be roughly catalogued as one each pertaining to films, cameras, and what is termed the "Latham loop," and three to projecting machines. The ownership of these patents was divided among some of the defendants. Others had no interest therein, except in so far as they dealt in the different apparatus, features of which were covered, or claimed to be covered, by the several patents, respectively. If the combination had been limited, and the agreements and the scheme in its entirety had possessed, or could be found to have, any normal real relation to the assertion and protection of these patented rights, and this had been the end proposed, the defendants would be upheld in the maintenance of such rights.

We are constrained, however, to find that there was no such relation, but that the end, directly proposed, was the imposition upon the

trade of an undue and unreasonable restraint, in order that, as the immediate and direct effect and result of the combination, the defendants might monopolize the trade in all the accessories of the motion picture art so far as they are articles of commerce. A further end proposed, and which has largely been achieved, is the domination of the motion picture business itself, and it requires no prophetic vision to foresee that the ultimate result would be that no play would be written, or dramatically enacted, except by authors and artists favored by the defendants.

It is further found as a fact that the defendants did, in furtherance of the scheme of the combination so to do, directly impose upon the trade undue and unreasonable restraint, and that such restraint was the end proposed to be directly reached, and was not merely incidental to efforts to protect the rights granted by the patents, but went far beyond the fair and normal possible scope of any efforts to protect such rights, and that as a direct and intended result of such undue and unreasonable restrictions the defendants have monopolized a large part of the interstate trade and commerce in films, cameras, projecting machines, and other articles of commerce accessory to the motion picture business.

It is further found, for what the finding may be worth, that although the ends proposed in the combination, and carried out by the defendants, were first this restraint, and through this the monopolizing of the trade, to reap commercial advantages to themselves, a further inducement and motive was (and these were also ends in view) the wish to relieve each other from the odium of infringement, to end contests which hampered the development of the art, to protect the morals of the public by the prevention of the exhibition of suggestive or otherwise improper pictures, to promote the progress of this branch of dramatic art by improving the character of the shows, both in the artistic merits and mechanical perfection of the display, and generally to supply what, up to that time, the state had neglected to furnish, a regulating and governing authority over the entire motion picture business. The end and purpose of the combination, and in this sense the motive or moving cause, further was not to protect the patent rights, which the Motion Picture Patents Company was organized to take over; but the control of the patents was made a feature of the scheme, in the belief, or at least the hope, that this would render the scheme (otherwise illegal) not open to the condemnation of the law.

We conclude with the formal finding, in the language of the act of Congress, that the contracts enumerated in the petition, and the combination there described, were a conspiracy in restraint of trade or commerce among the several states and with foreign nations, and were and are illegal, and that the defendants and each of them (with the exception next noted) have attempted to monopolize, and have monopolized, and have combined and conspired, among themselves and with each other, to monopolize, a part of the trade or commerce among the several states and with foreign nations, consisting of the trade in films, cameras, projecting machines, and other accessories of the motion picture business, as charged in the petition of complaint filed.

The exception referred to is this: Melies Manufacturing Company one of the corporation defendants named in the petition, has denied (as have all of the defendants) that it was in any sense a party to the combination charged. We have gone over all the proofs, without finding any, which go to making good of the charge against this particular defendant. It is therefore excluded from the findings made, and the petition as against it is dismissed.

The conclusion is that the petitioner is entitled to the relief prayed, so far as indicated by this opinion, and a decree to effectuate the findings made may be submitted. This statement should perhaps be added: The point has been raised by the United States that the Edison patent on the picture film was limited to its negative form, and did not cover the positive motion picture films, which were dealt in commercially. The conclusions to which we have arrived have been reached without such a finding.