## HARTFORD-EMPIRE CO. ET AL. v. UNITED STATES.

NO. 2.

Argued November 15, 16, 17, 18, 1943. Reargued October 9, 10, 1944.—Decided January 8, 1945.

*Mr. John T. Cahill,* with whom *Messrs. Thurlow M. Gordon, Stuart S. Wall, Jerrold G. Van Cise, James M. Carlisle,* and *E. J. Marshall* were on the brief, for appel-

lants in No. 2. *Mr. Thurlow M. Gordon,* on the original argument, and *Mr. Boykin C. Wright,* on the reargument, with whom *Messrs. George Nebolsine, Halsey Sayles, Paul H. Fox, Thomas E. Harris,* and *John W. Nields* were on the brief, for appellants in No. 3. *Mr. Robert T. Swaine,* with whom *Messrs. Lloyd T. Williams, Henry A. Middleton, George B. Turner, Nestor S. Foley, Roy T. Parker, Jr., E. P. Wood, Albert R. Connelly,* and *Frederick H. Wood* were on the brief, for appellants in No. 4. *Mr. Stephen H. Philbin,* with whom *Mr. Joseph D. Stecher* was on the brief, for appellants in No. 5. *Mr. Ralph Emery* argued the cause on the original argument and submitted on the reargument for appellants in No. 6. *Mr. Lehr Fess,* with whom *Mr. Frank S. Lewis* was on the brief, for appellants in No. 7. *Mr. E. W. McCallister,* with whom *Messrs. Carl F. Schaffer, A. M. Bracken,* and *Wilber Owen* were on the brief, for appellants in No. 8. *Mr. Luther Day,* with whom *Messrs. Rufus S. Day* and *Thomas O. Nevison* were on the brief, for appellants in No. 9. *Mr. Fred E. Fuller,* with whom *Messrs. George D. Welles, Fred A. Smith,* and *Hugh C. McLaughlin* were on the brief, for appellants in Nos. 10 and 11.

*Assistant Attorney General Cox* and *Mr. Samuel S. Isseks,* with whom *Solicitor General Fahy, Assistant Attorney General Berge,* and *Messrs. Lawrence S. Apsey, Robert L. Stern, Edward H. Levi, Philip Marcus, Lawrence C. Kingsland, Victor H. Kramer,* and *Seymour D. Lewis* were on the brief, for the United States.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

These are appeals from a decree[1] awarding an injunction against violations of §§ 1 and 2 of the Sherman Act, as amended,[2] and § 3 of the Clayton Act.[3] Two questions are presented. Were violations proved? If so, are the provisions of the decree right?

The complaint named as defendants 12 corporations and 101 individuals associated with them as officers or directors. It was dismissed as to 3 corporations and 40 individuals. The corporations are the leaders in automatic glassmaking machinery and in the glassware industry. The charge is that all the defendants agreed, conspired, and combined to monopolize, and did monopolize and restrain interstate and foreign commerce by acquiring patents covering the manufacture of glassmaking machinery, and by excluding others from a fair opportunity freely to engage in commerce in such machinery and in the manufacture and distribution of glass products. The gravamen of the case is that the defendants have cooperated in obtaining and licensing patents covering glassmaking machinery, have limited and restricted the use of the patented machinery by a network of agreements, and have maintained prices for unpatented glassware.

The trial lasted 112 days. The court filed an opinion of 160 pages, 628 findings of fact and 89 conclusions of law, and entered a decree covering 46 printed pages and comprising 60 numbered paragraphs. The printed record contains over 16,500 pages. An opinion of reasonable length must deal in summary fashion with the facts disclosed by the proofs and leave much of the detailed his-

[1] 46 F. Supp. 541.
[2] 15 U. S. C. §§ 1 and 2.
[3] 15 U. S. C. § 14.

tory of the transactions to be gleaned from the opinion below.

In 1912 Hartford-Fairmont Company was organized to combine the activities of two existing companies interested in glass manufacture with those of a group of engineers who desired to obtain and exploit patents for automatic glassmaking machinery. The defendant Corning Glass Works was, at that time, engaged primarily in the production and distribution of incandescent bulbs, sign and optical ware, heat-resisting ware and other specialty glassware. Its field may be defined roughly as the pressed and blown field, or the noncontainer field. It has not made, and does not now make, containers save a limited amount of tumblers. In 1909 persons interested in Corning organized Empire Machine Company as a patent holding and developing company.

The defendant Owens-Illinois Glass Company (hereinafter called Owens) is a large manufacturer of glass. Mr. Owens of that company produced the first fully automatic machine for blowing bottles, which is known as a suction type machine. He was interested in companies engaged in developing and manufacturing this type of machine and exercising the rights represented by the Owens and related patents. From about 1904 the Owens group followed the policy of granting exclusive licenses, in limited fields, for the manufacture of glassware by the suction process. Owens itself was, and is, mainly interested in what is known as narrow neck container ware. Prior to the Owens inventions glassmaking had been largely a hand process. Thereafter, due to Owens' restrictive licensing policy, many glass manufacturers were threatened with extinction unless some other competing machine could be devised. Ultimately a process, called suspended gob feeding, was invented, which was more economical for certain ware than the suction process, and could be

applied in the manufacture of diversified glassware. The introduction of the gob feeder machine threatened Owens' domination of the glass machinery field and Owens, in self-protection, obtained patents and patent rights on gob feeders and licensed some companies for their use.

Hartford-Fairmont was interested in the development of the gob feeder. It applied for some patents and acquired others. In the meantime, it licensed gob feeder machinery, as Owens had done with the suction machine, by restricting its use to the manufacture of specified ware. Empire owned certain patent applications which were in interference with Hartford-Fairmont gob feeder applications.

June 30, 1916, Hartford-Fairmont and Empire made an agreement whereby Empire was given an exclusive license to use Hartford-Fairmont's patents for pressed and blown glassware and Hartford-Fairmont was given an exclusive license to use Empire's patents for production of containers. Thus Corning obtained exclusive rights, under the patents, for Corning's line of ware,—pressed and blown glass,—and Hartford obtained the patent rights of both companies in respect of other glassware. Negotiations led to agreements, October 6, 1922, whereby Hartford-Empire (hereinafter called Hartford) was formed and took over all assets of Hartford-Fairmont and of Empire relating to glass machinery. Empire received 43% of the stock of the company and Corning retained approximately the same exclusive interest that Empire had enjoyed under the 1916 agreement. Hartford retained approximately the same rights it had obtained from Empire in 1916 subject to a shop right in Corning which has not been exercised. Empire was dissolved in 1941.

After 1916 Hartford-Fairmont (and its successor Hartford) and Owens were competitors in the gob feeding field; their applications were in interference in the Patent Office with each other and with those of other applicants; and

they were in litigation. As a result of negotiations for a settlement of their disputes, they entered into an agreement April 9, 1924, whereby Owens granted Hartford an exclusive license under Owens' patents for gob feeder and forming machines and Hartford granted Owens a nonexclusive, nonassignable, and nondivisible license to make and use machines and methods embodying patents then or thereafter owned or acquired by Hartford for the manufacture of glassware, but Owens was not to sell or license gob feeding machinery and was excluded from the pressed and blown field previously reserved to Corning. Owens was to receive one-half of Hartford's divisible income from licenses over and above $600,000 per annum. Owens retained a veto power on Hartford's granting new licenses on machines embodying Owens' inventions. This provision was eliminated in 1931. The agreement left Owens in full control of its patented suction process.

As soon as the agreement had been made, Hartford and Owens combined to get control of all other feeder patents. In this endeavor they pooled the efforts of their legal staffs and contributed equally to the purchase of patents and the expenses of litigation.

While patent claims upon applications controlled by Hartford and Owens were pending in the Patent Office, Hartford purchased, under the joint arrangement, certain feeder patents and applications belonging to outsiders, and persons to whom feeders had been sold or licensed by such outsiders were persuaded to take licenses from Hartford. As a result of Hartford's and Owens' joint efforts in connection with patent applications and purchases of applications and patents of others, Hartford obtained what it considered controlling patents on gob feeders in 1926.

Hazel-Atlas Glass Company (hereinafter called Hazel) was second to Owens in the manufacture and sale of glass containers. It had been using feeders of its own design

and manufacture. To build up further patent control, to discourage use of machinery not covered by their patents, and to influence glassmakers to take licenses under Hartford's inventions, Hartford and Owens desired that Hazel should become a partner-licensee. In 1924 they negotiated with Hazel to this end and offered to return to Hazel a substantial portion of any royalties it would have to pay as a licensee. No agreement was reached and Hartford brought infringement suits against Hazel and its subsidiaries. One Circuit Court of Appeals decided favorably to Hazel; another favorably to Hartford. Shortly after the latter decision, Hartford and Owens, in order to buttress the patent situation, persuaded Hazel to make a settlement.

As of June 1, 1932, Hartford, Owens, and Hazel executed a series of agreements. Hartford licensed Hazel under Hartford's patents, excluding from the license the pressed and blown field reserved to Corning and with restrictions against sale or license by Hazel to anyone else. Hazel licensed Hartford under all its glass machinery patents, present and future, to January 3, 1945. Hazel paid Hartford $1,000,000 and agreed to pay Hartford royalties, and Hartford agreed that Hazel and Owens should each receive one-third of Hartford's net income from royalties and license fees over and above $850,000 per annum. Hartford and Owens readjusted their contractual status to conform it to the agreements with Hazel. Owens maintained control of its own suction inventions. It confirmed to Hazel its existing rights under earlier agreements to use these. Owens obtained an option either to purchase, or to become licensee, of any suction inventions controlled by Hartford and agreed, in event of such acquisition, to permit Hazel to use them. Owens and Hazel had the option, on notice, to terminate their contracts with Hartford but agreed mutually to protect each other in such event. The result of this combination was that

resistance to Hartford's licensing campaign disappeared and practically the entire industry took licenses from Hartford.

Thatcher Manufacturing Company, a large manufacturer of milk bottles, early obtained an exclusive license to manufacture them on the Owens suction machine. In 1920 Thatcher secured the exclusive right to manufacture milk bottles on Hartford's paddle needle feeder and milk bottle forming machine. It pressed for like rights under Hartford's later device, the single feeder. Though refusing the grant, Hartford assured Thatcher that it would be given every consideration in the grant of further licenses. By a supplemental agreement of December 1, 1925, Hartford, in view of its "moral obligation" to Thatcher, agreed to pay and, until January 1, 1936, allowed Thatcher a rebate on a certain portion of Thatcher's production, and, in 1928, agreed to give Thatcher the refusal of any exclusive license on feeders and formers for production of milk bottles. In 1936 a new agreement was made whereby Hartford agreed that, so long as Thatcher manufactured 750,000 gross per annum, Hartford would grant no other license for manufacture of milk bottles.

Ball Brothers, the largest manufacturer of domestic fruit jars, had used machines of its own design as well as the Owens suction machines under license, but had never taken any license from Hartford. In 1933 Ball took a license from Hartford, obtaining all the residual rights of Hartford for the manufacture of fruit jars, and, *inter alia*, granted Hartford an option to take licenses on all Ball's patents for glass machinery then owned or thereafter acquired. After discussion as to the rights of Hazel and Owens to manufacture fruit jars, it was proposed that they be limited by written agreement, Hazel to 300,000 gross and Owens to 100,000 gross annually. It was decided not to have a written agreement but both have generally kept within these limits. When the complaint

was filed Ball Brothers manufactured approximately 54.5% of all the fruit jars manufactured and sold in the United States, Hazel 17.6%, Owens 6.4%, and an outsider, using a machine on which the patents had expired, 21.5%.

In granting licenses under the pooled patents Hartford always reserved the rights within Corning's field. Further, it not only limited its licensees to certain portions of the container field but, in many instances, limited the amount of glassware which might be produced by the licensee and, in numerous instances, as a result of conferences with Owens, Hazel, Thatcher and Ball, refused licenses to prevent overstocking the glassware market and to "stabilize" the prices at which such ware was sold.

In the automatic manufacture of glassware, other machines are used in connection with the feeders. These are known as forming machines, stackers, and lehrs. The purpose of Hartford and Owens, participated in by the other three large manufacturers mentioned, was that there should be gathered into the pool patents covering and monopolizing these adjunct machines so that automatic glass manufacture, without consent of the parties to the pool, would become difficult if not impossible.

Several forming machines not covered by Hartford patents were on the market. Without going into detail, it is sufficient to say that, by purchases of patents and manufacturing plants, and by an agreement with Hartford's principal competitor, Lynch Manufacturing Company, the field was divided between Hartford and Lynch under restrictions which gave Hartford control. In the upshot it became impossible to use Hartford feeders with any other forming machine than one licensed by Hartford or used by its consent, and, as respects stackers and lehrs, Hartford attained a similar dominant status.

In 1935 certain new agreements were made. Though the 1932 agreement between Hartford and Hazel was sub-

stantially unaffected, the contract relationships between Hartford and Owens were altered. The latter surrendered its right to one-third of Hartford's divisible royalty and license income in consideration of Hartford's promise to pay $2,500,000 in quarterly instalments. Owens extended the term of Hartford's license under certain Owens inventions and Hartford granted Owens a royalty-free, non-exclusive license under all Hartford's suction patents for the life of the patents, excluding, however, glassware in Corning's field. Other unimportant changes were made in existing contracts. Owens and Hazel thereupon amended their agreements so as to protect Hazel in event the contract relations between Owens and Hartford should be altered.

Owens insists that, by the 1935 agreements, it terminated all its relations with others which could violate the antitrust statutes. But the 1935 agreements left Hartford in undisputed control of the gob feeder field, and Owens in like control of the suction field. And they evidently relied on the situation which had been built up, their mutual interests, and other factors, as sufficient to guarantee continuance of existing restraints and monopolies without the necessity of formal contracts. The District Court found Owens did not abandon the conspiracy in 1935 and there is evidence to support the conclusion.

In 1919 the Glass Container Association of America was formed. Prior to 1933 its members produced 82% of the glass containers made in the United States and since have produced 92%. Since 1931 (except while the National Industrial Recovery Act was in force) the Association has had a statistical committee of seven, on which Owens, Hazel, Thatcher, and, since 1933, Ball were represented. These appellants also were represented in the Board of Directors. Hartford, though not a member, has closely cooperated with the officers of the association in efforts to discourage outsiders from increasing produc-

tion of glassware and newcomers from entering the field. The court below, on sufficient evidence, has found that the association, through its statistical committee, assigned production quotas to its members and that they and Hartford were zealous in seeing that these were observed.

In summary, the situation brought about in the glass industry, and existing in 1938, was this: Hartford, with the technical and financial aid of others in the conspiracy, had acquired, by issue to it or assignment from the owners, more than 600 patents. These, with over 100 Corning controlled patents, over 60 Owens patents, over 70 Hazel patents, and some 12 Lynch patents, had been, by cross-licensing agreements, merged into a pool which effectually controlled the industry. This control was exercised to allot production in Corning's field to Corning, and that in restricted classes within the general container field to Owens, Hazel, Thatcher, Ball, and such other smaller manufacturers as the group agreed should be licensed. The result was that 94% of the glass containers manufactured in this country on feeders and formers were made on machinery licensed under the pooled patents.

The District Court found that invention of glassmaking machinery had been discouraged, that competition in the manufacture and sale or licensing of such machinery had been suppressed, and that the system of restricted licensing had been employed to suppress competition in the manufacture of unpatented glassware and to maintain prices of the manufactured product. The findings are full and adequate and are supported by evidence, much of it contemporary writings of corporate defendants or their officers and agents.

In 1938 the Temporary National Economic Committee investigated the glassmaking industry. Many of the facts disclosed in this record were developed. Subsequently this suit was brought and, in pretrial conferences, the Government stated its view as to the terms of agree-

ments and the practices it deemed illegal. The principal corporate appellants had made some alterations in their arrangements and, after institution of suit,—and on occasions up to submission of the case on the proofs,—made further modifications on their own responsibility, and without concurrence of the appellee or the judge, in an effort to remedy alleged illegal conditions.

As a consequence, when the case stood for decision, the situation was as follows: The restrictions in the 1935 agreement between Hartford and Owens were removed, the exclusive provision, and the exclusions of the manufacture of certain glassware embodied in the 1935 agreements between Owens and Hazel were waived by Owens. Ball had surrendered its residual exclusive right for fruit jars and released a claim against Hartford thereunder for $425,000 in consideration of Hartford surrendering its option to acquire any Ball feeder inventions. Hartford withdrew the exclusive features of all its licenses of glass machinery. Hartford retained dominance of the gob feeder field. Owens, although its basic patent had expired, continued, by virtue of improvement patents, to dominate the suction field. Owens, Lynch, and Hartford were the leaders, if not altogether dominant in the forming machine field.

In July 1939 the Association changed the nature of its statistical reports which the court found were in reality assignments of quotas, and professed to have abandoned a voluntary exchange of statistical data which had previously taken place at committee or general meetings. It then adopted a form of statistical statement eliminating all forecasts and confined its reports to past performances of the members.

We affirm the District Court's findings and conclusions that the corporate appellants combined in violation of the Sherman Act, that Hartford and Lynch contracted in violation of the Clayton Act, and that the individual ap-

pellants with exceptions to be noted participated in the violations in their capacities as officers and directors of the corporations.

Certain individual appellants insist that the finding that they were parties to the conspiracy must be set aside. In No. 10, Isaac J. Collins appeals from that portion of the decree which adjudges him a party to the conspiracy and grants relief against him, and, in No. 11, Fulton, Fisher, and Dilworth challenge their inclusion in the decree.

When suit was instituted Collins was president of, and Fulton, Fisher, and Dilworth were officially connected with, Anchor Hocking Glass Company. All had been officers, directors, and stockholders of companies which Anchor Hocking absorbed. Anchor Hocking is, and its predecessors were, manufacturers of glassware. None were holders of machine patents or in the glass machine business. In the bill of complaint the charges against individuals were made by alleging that a company, and certain individual defendants connected with it, had become parties to the conspiracy. The bill charged that in 1937 Anchor Hocking and certain defendants, being its officers and directors, joined the conspiracy. The appellants in question were named as amongst these Anchor Hocking defendants and were not elsewhere in the bill specifically charged with otherwise participating in the conspiracy.

At the close of the Government's case motions were made to dismiss the bill as to Anchor Hocking and all the directors and officers of that company, including Collins, Fulton, Fisher, and Dilworth, on the ground that the Government had failed to prove any participation by them in the alleged conspiracy. The court granted the motion with respect to all of them except Collins. Thereupon these defendants withdrew and did not participate further in the trial. Some months later, on a motion of the Government for rehearing of the order of

dismissal, the court refused to alter its order with respect to Anchor Hocking or the defendants associated with it, save only Fulton, Fisher, and Dilworth. As to them, it granted rehearings and restored them as defendants of record. When the findings and conclusions were entered these appellants were named as participants in the conspiracy and were included in the injunctions embodied in various sections of the decree.

We think the decree against them must be reversed for want of allegations in the bill sufficient to support a decree against them; because the findings made do not support the decree as to them; because the refusal of findings requested by the Government exculpates them of participation in the conspiracy; and, finally, because the proofs fail to connect them with it.

Fulton, Fisher, and Dilworth each hold stock of Hartford which they acquired many years ago. A company in which they were interested owned Hartford stock and pledged it under a mortgage. The company got into difficulties, the mortgage was in default, and they and others took over the pledged Hartford stock for cash so as to put the company in funds to refinance its mortgage.

The three appellants are amongst the two hundred or more stockholders of Hartford. The bill does not, and could not, charge them in their capacity as stockholders of Hartford, as parties to the conspiracy, and they are not to be enjoined by reason of their stock holdings in Hartford.

As we have said, they were officers and directors of certain predecessor companies taken over by Anchor Hocking, which were not charged in the bill as participants in the conspiracy. Anchor Hocking was so charged and these appellants and other individuals were charged in the bill to have been, and then to be, officers and directors participating in the direction and management of Anchor Hocking. The complaint adds: "Such individual defend-

ants have approved, authorized, ordered, and done some or all the acts herein alleged to have been performed by defendant Anchor Hocking." They are not otherwise specifically charged with participating in the conspiracy. It would seem, therefore, that when Anchor Hocking was found not to have participated the only basis for charging them disappeared. Moreover, the Government's proofs went no farther than to show that these appellants acted in the business affairs of Anchor Hocking. There is no proof that they conspired or cooperated with other companies parties to the conspiracy, or with other individuals who were officers and directors of such corporations. The only findings as to all are to the effect that they have been officers and directors of Anchor Hocking and its predecessors, and stockholders of Hartford and, as to one, that, in addition, as a Hartford-Fairmont stockholder, he signed the agreement in 1922 for the formation of Hartford-Empire. The Government requested the court to find, with respect to them, a number of facts which, if found, would have connected them with the conspiracy. The court refused the requests. Nowhere in the findings or in the opinion is any reason given why these appellants should be included in the injunction. As to them, the decree must be reversed.

Anchor Hocking was a licensee of Hartford machinery. The appellant Collins thought the royalty charged was excessive and complained repeatedly about it; and, believing that his company was free to make glass of any character on any kind of machinery, he complained about the exclusive features of the license. He repeatedly aroused the resentment of Hartford and some of the other participants in the conspiracy by his assertion of the purpose to use machinery and to manufacture glassware in ways they thought contrary to his company's rights as a licensee. There were even discussions as to

whether the company should be sued. This evidence is uncontradicted.

Collins is a stockholder of Hartford. He acquired his original stock interest in the same way that Fulton, Fisher, and Dilworth did. In 1926 he was elected a director, and remained such until 1937, when he resigned. This was prior to the T. N. E. C. hearing in which the Hartford licensing system was investigated and prior to the institution of suit. There is no evidence or finding of any reasonable likelihood that he will resume the directorship. Moreover, the bill charges that Anchor Hocking and the individuals connected with it entered the conspiracy in 1937.

The bill does not charge Collins with any act as officer or director of, or as participant in the direction and management of, Hartford. The only charge against him is in respect of his connection with Anchor Hocking. The evidence is that Collins was an irregular attendant at directors' meetings of Hartford; that he was not on any committee of the board which had direct contact with the management and patent affairs of Hartford; that he did not know of the preferred terms under which Owens and Hazel were licensed by Hartford until the matter was disclosed in the T. N. E. C. hearings and then criticized the arrangement. There is no evidence that, as a director of Hartford, he knew, approved, or voted in favor of any of the actions taken pursuant to the conspiracy. On the contrary, the evidence is uncontradicted that he repeatedly advocated more liberal licensing by Hartford and thought its royalties too high. As in the case of the other appellants mentioned, the Government requested findings of fact which, if made, would have spelled out a connection between Collins and the other conspirators but these were refused by the judge. Collins is found to have been, and still to be, a member of the Association's

statistical committee, but the bill does not charge him individually with any conduct in that relation. Of course, any injunction against the Association and its officers and agents will bind him so long as he remains in that relationship. Two other findings as to his activities as a director of Hartford, and as president of General Glass Company, touch matters as to which the bill of complaint is silent and concerning which the evidence is not persuasive of participation in any conspiracy charged or proved. We are of opinion that as to Collins, the bill should be dismissed.

I

Little need be said concerning the legal principles which vindicate the District Court's findings and conclusions as to the corporate appellants and the individual appellants who as officers or directors participated in the corporate acts which forwarded the objects of the conspiracy. As was said in *Standard Sanitary Mfg. Co. v. United States,* 226 U. S. 20, 49:

"Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained."

The difference between legitimate use and prohibited abuse of the restrictions incident to the ownership of patents by the pooling of them is discussed in *Standard Oil Co. v. United States,* 283 U. S. 163. Application of the tests there announced sustains the District Court's decision. It is clear that, by cooperative arrangements and binding agreements, the appellant corporations, over a period of years, regulated and suppressed competition in the use of glassmaking machinery and employed their

joint patent position to allocate fields of manufacture and to maintain prices of unpatented glassware.

The explanations offered by the appellants are unconvincing. It is said, on behalf of Hartford, that its business, in its inception, was lawful and within the patent laws; and that, in order to protect its legitimate interests as holder of patents for automatic glass machinery, it was justified in buying up and fencing off improvement patents, the grant of which, while leaving the fundamental inventions untouched, would hamper their use unless tribute were paid to the owners of the so-called improvements which, of themselves, had only a nuisance value.

The explanation fails to account for the offensive and defensive alliance of patent owners with its concomitant stifling of initiative, invention, and competition.

Nor can Owens' contention prevail that it long ago abandoned any cooperation with the other corporate defendants and has been free of any trammel to unrestricted competition either in the machinery or glass field. Owens remained active in the association. It remained dominant in the suction field. It continued in close touch with Hartford and with other large manufacturers of glassware who were parties to the conspiracy. The District Court was justified in finding that the mere cancellation of the written word was not enough, in the light of subsequent conduct, to acquit Owens of further participation in the conspiracy.

Individual appellants, except Collins, Fulton, Fisher, and Dilworth, who were officers or directors of corporate appellants each did one or more acts, such as negotiating, voting for, or executing agreements which constituted steps in the progress of the conspiracy. To this extent they participated in violations of the statutes. Some were more active and played a more responsible role than others.

## II

The Government sought the dissolution of Hartford. The court, however, decided that a continuance of certain of Hartford's activities would be of advantage to the glass industry and denied, for the time being, that form of relief. The court was of opinion, however, that the long series of transactions and the persistent manifestations of a purpose to violate the antitrust statutes required the entry of a decree which would preclude the resumption of unlawful practices. It was faced, therefore, with the difficult problem of awarding an injunction which would insure the desired end without imposing punishments or other sanctions for past misconduct, a problem especially difficult in view of the status and relationship of the parties.

At the trial the Government stated that in this suit it was not attacking the validity of any patent or claiming any patent had been awarded an improper priority.

At the time of the District Court's decision, Hartford had reduced the royalties of all its licensees to its then schedule of standard royalties so that all stood on an equal basis so far as license fees were concerned. Government counsel did not assert, or attempt to prove, that these royalties were not reasonable in amount.

Owens, as respects suction invention licenses, had removed all restrictive clauses; Hartford had done the same with respect to all its glass machinery licenses and so had Hartford and Lynch with respect to forming machine licenses. At the moment, therefore, no licensee was restricted either as to kind or quantity of glassware it might manufacture by use of the patented machines, and no patent owner was restricted by formal agreement as to the use or licensing of its patents.

Just before the trial, Hartford conveyed three patents to Corning and complaint was made of this transaction.

Corning paid a substantial sum for the transfer, evidently to prevent Hartford's obstructing Corning's free and untrammeled use of its own patents. Two of the assigned patents have expired and Corning professes its willingness to dedicate the third to the public.

The association had ceased to allot quotas amongst the glass manufacturers or to furnish advance information or make recommendations to its members. The licensing system of Hartford remained that of leasing machinery built for it embodying the patented inventions. Rentals consisted of standard royalties on production. Under this system Hartford rendered a service in the repair, maintenance, and protection of the machines, which is valuable, if not essential, to the users. This was the status with which the court had to deal.

The applicable principles are not doubtful. The Sherman Act provides criminal penalties for its violation, and authorizes the recovery of a penal sum in addition to damages in a civil suit by one injured by violation. It also authorizes an injunction to prevent continuing violations by those acting contrary to its proscriptions. The present suit is in the last named category and we may not impose penalties [4] in the guise of preventing future violations. This is not to say that a decree need deal only with the exact type of acts found to have been committed [5] or that the court should not, in framing its decree, resolve all doubts in favor of the Government,[6] or may not prohibit acts which in another setting would be unobjectionable. But, even so, the court may not create, as to the defendants, new duties, prescription of which is the function of Congress, or place the defendants, for the future, "in a different class than other people," as the Govern-

---

[4] *Standard Oil Co.* v. *United States*, 221 U. S. 1, 77–78.

[5] *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 461.

[6] *Local 167* v. *United States*, 291 U. S. 293, 299.

ment has suggested. The decree must not be "so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt"; enjoin "all possible breaches of the law"; [7] or cause the defendants hereafter not "to be under the protection of the law of the land." [8] With these principles in mind we proceed to examine the terms of the decree entered. No reference will be made to paragraphs as to which the appellants do not object if any decree is to be entered, nor to those concerning which we think objection is not well founded.

The decree must be modified to eliminate the appellants Collins, Dilworth, Fulton, and Fisher.

Paragraph 1 (D) should be modified to limit its coverage to the United States, and clause (a) should be stricken as too indefinite for enforcement.

The Government concedes that paragraph 5 should be modified to confine to heat-resistant ware the adjudication that Corning, Hartford, and Empire, and the individual defendants associated with each, have monopolized and attempted to monopolize trade in violation of § 2 of the Sherman Act. This involves exclusion from the paragraph of reference to laboratory, paste mold, and electrical ware. To comport with the record the phrase "ovenware" should be substituted for "heat-resistant ware."

The Government also agrees to the elimination of paragraph 9, which generally enjoins the appellants from violations "as charged in the complaint." This concession is required by statute, by the Rules of Civil Procedure, and by our decisions. [9]

---

[7] *Swift & Co.* v. *United States*, 196 U. S. 375, 396; *Labor Board* v. *Express Publishing Co.*, 312 U. S. 426, 433, 435–6.

[8] *New York, N. H. & H. R. Co.* v. *Interstate Commerce Comm'n*, 200 U. S. 361, 404; *Standard Oil Co.* v. *United States, supra,* 80.

[9] Rule 65 (d), 28 U. S. C. A. following § 723c; § 19 of the Clayton Act, 38 Stat. 738, 28 U. S. C. § 383; *Swift & Co.* v. *United States*, 196 U. S. 375, 396, 401.

The court appointed a receiver for Hartford *pendente lite*. By paragraphs 10 to 20 of the final decree it continued him in office and gave directions as to his administration of Hartford's affairs, including certain actions to be taken to effectuate features of the decree affecting Hartford's business and licenses, which will later be described, and meantime to continue the receipt of royalties under existing licenses, these to be repaid to the licensees on the decree becoming final. The court also ordered the impounding of the sums payable by Hazel to Hartford, and by Hartford to Hazel, under the 1932 agreement, until the decree should become final. Ball Brothers was ordered to pay into court the $425,000 received from Hartford pursuant to the amendment, August 1, 1940, of Ball's feeder license agreement, but no disposition of the fund was directed (Paragraph 44). Corning was directed to pay into court the moneys received by it from Hartford in connection with the amending agreements of September 23 and December 1, 1940, and that fund is held by the clerk pending the further order of the court (Paragraph 45-A).

While useful for the preservation of rights pending the determination of this litigation, in the light of what is hereafter said as to the substantive provisions of the decree, the receivership and the impounding of funds were not necessary to the prescription of appropriate relief. The receivership should be wound up and the business returned to Hartford. The royalties paid to the receiver by Hartford's lessees may, unless the District Court finds that Hartford has, since the entry of the receivership decree, violated the antitrust laws, or acted contrary to the terms of the final decree as modified by this opinion, be paid over to Hartford. In any event Hartford should receive out of these royalties compensation on a *quantum meruit* basis, for services rendered to lessees. The other funds paid into court and impounded in the registry should be repaid to those who paid them into court.

Paragraphs 21, 22, and 23 apply to the corporate defendants and to any of the individual defendants who shall hereafter engage in the business of distributing glassware machinery. They forbid any disposition or transfer of possession of such machinery by any means other than an outright sale, and require Hartford to offer in writing to sell each of the present lessees all the machinery now under lease to such lessee at a reasonable price to be fixed in consideration of the fees and royalties heretofore paid, any dispute as to price to be settled by the court. All of the corporate defendants and the individual defendants are required, if they engage in the business of distributing glassmaking machinery, to file a writing with the court agreeing to offer, and to continue to offer, to sell any machinery used in the manufacture of glassware to any applicant at reasonable and equal prices and upon reasonable and equal terms and conditions.

All of the appellants attack these provisions. A common ground is that this court has held that the lease of a patented machine is a lawful method of exercising the exclusive patent right of practicing or using the invention,[10] and that effective relief may be afforded without destroying the appellants' property rights in the patents they own.

Hazel, Thatcher, and Ball object to the injunction directed to them on the ground that none of them has ever been in the business of selling, licensing, or distributing such machinery. The Government replies that the injunction is intended only to prevent them from again

---

[10] *United States* v. *United Shoe Machinery Co.,* 247 U. S. 32; *United Shoe Machinery Corp.* v. *United States,* 258 U. S. 451, 462. In this case the court divided on the question of the legality of certain terms of the leases in question, but the dissenting justices did not suggest that a lease was not an appropriate method of exercising rights under the patent. Cf. *International Business Machines Corp.* v. *United States,* 298 U. S. 131.

setting up a patent pool and monopolizing the patented inventions. The decree should enjoin the defendants from setting up such a pool or combining or hereafter agreeing to monopolize the glass machinery or the glassware industry, as we think it does in other paragraphs. But the decree as entered requires that each of the defendants must hereafter forever abstain from leasing a patented machine, no matter what the date of the invention, and compels each of them if he desires to distribute patented machinery to sell the machine which embodies the patent to everyone who applies, at a price to be fixed by the court. The injunction as drawn is not directed at any combination, agreement or conspiracy. It binds every defendant forever irrespective of his connection with any other or of the independence of his action.

Paragraph 24 enjoins each of the corporate and individual appellants from engaging in the distribution of machinery used in glass manufacture or in the distribution of glassware in interstate commerce unless each files with the court an agreement (a) to license, without royalty or charge of any kind, and for the life of all patents, any applicant to make, to have made for it, and to use any number of machines and methods embodied in inventions covered by any patent or patent application now owned or controlled by such defendant; (b) to license, at a reasonable royalty (to be fixed by the court, in case of dispute) any applicant to make, have made for it, and to use any number of machines and methods in the manufacture of glassware embodying inventions covered by patents hereafter applied for or owned or controlled by any defendants; (c) to make available to any licensee, under "(a)" and "(b)," at cost, plus a reasonable profit, all drawings and patterns "relating to the machinery or methods used in the manufacture of glassware" em-

bodied in the licensed inventions (with immaterial exceptions).

Since the provisions of paragraphs 21 to 24 inclusive, in effect confiscate considerable portions of the appellants' property, we think they go beyond what is required to dissolve the combination and prevent future combinations of like character. It is to be borne in mind that the Government has not, in this litigation, attacked the validity of any patent or the priority ascribed to any by the Patent Office, nor has it attacked, as excessive or unreasonable, the standard royalties heretofore exacted by Hartford. Hartford has reduced all of its royalties to a uniform scale and has waived and abolished and agreed to waive and abolish all restrictions and limitations in its outstanding leases so that every licensee shall be at liberty to use the machinery for the manufacture of any kind or quantity of glassware comprehended within the decree. Moreover, if licenses or assignments by any one of the corporate defendants to any other still contain any offensive provision, such provision can, by appropriate injunction, be cancelled, so that the owner of each patent will have unrestricted freedom to use and to license, and every licensee equally with every other will be free of restriction as to the use of the leased or licensed machinery, method or process, or the articles manufactured thereon or thereunder.

It is suggested that there is not confiscation since Hartford might, with the later consent of the court, sell its patents. Under the decree as entered below nothing can be obtained by Hartford for the use of its patents and we cannot speculate as to what might be the ultimate adjustments made by the trial court in the decree.

If, as suggested, some of Hartford's patents were improperly obtained, or if some of them were awarded a priority to which the invention was not entitled, avenues

are open to the Government to raise these questions and to have the patents cancelled. But if, as we must assume on this record, a defendant owns valid patents, it is difficult to say that, however much in the past such defendant has abused the rights thereby conferred, it must now dedicate them to the public.

That a patent is property, protected against appropriation both by individuals and by government, has long been settled.[11] In recognition of this quality of a patent the courts, in enjoining violations of the Sherman Act arising from the use of patent licenses, agreements, and leases, have abstained from action which amounted to a forfeiture of the patents.[12]

The Government urges that such forfeiture is justified by our recent decisions in *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488, and *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495. But those cases merely apply the doctrine that, so long as the patent owner is using his patent in violation of the antitrust laws, he cannot restrain infringement of it by others. We were not there concerned with the problem whether, when a violation of the antitrust laws was to be restrained and discontinued, the court could, as part of the relief, forfeit the patents of those who had been guilty of the violation. Lower federal courts

---

[11] *James* v. *Campbell*, 104 U. S. 356, 357, 358; *Hollister* v. *Benedict & Burnham Mfg. Co.*, 113 U. S. 59, 67; *Wm. Cramp & Sons Co.* v. *International Curtis Marine Co.*, 246 U. S. 28, 39–40; *United States* v. *Dubilier Condenser Corp.*, 289 U. S. 178, 189.

[12] See *Standard Sanitary Mfg. Co.* v. *United States*, 226 U. S. 20. Decrees and Judgments in Federal Antitrust Cases (1918) p. 265; *United States* v. *Motion Picture Patents Co.*, 225 F. 800, appeal dismissed 247 U. S. 524. Decrees and Judgments in Federal Antitrust Cases (1918) pp. 379–380; *United Shoe Machinery Corp.* v. *United States*, 258 U. S. 451; *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436; *United States* v. *Univis Lens Co.*, 316 U. S. 241.

have rightly refused to extend the doctrine of those cases to antitrust decrees by inserting forfeiture provisions.[13]

Legislative history is also enlightening upon this point. Repeatedly since 1908 legislation has been proposed in Congress to give the courts power to cancel a patent which has been used as an instrument to violate antitrust laws.[14] Congress has not adopted such legislation. The temporary National Economic Committee recommended imposition of such a penalty for violation of antitrust laws.[15] But its recommendation was not adopted by Congress.

The Government suggests that certain earlier decisions under the Sherman Act, by analogy, support these portions of the decree.[16] The cases cited, however, do not sustain the suggestion. In all of them the court refrained from ordering compulsory dealing with the assets of the defendant without compensation and, in most of them, the decrees merely called for rearrangement of ownership, not for its destruction.

---

[13] *American Lecithin Co.* v. *Warfield Co.*, 105 F. 2d 207, 211; *Novadel-Agene Corp.* v. *Penn*, 119 F. 2d 764, 766–7; *Sylvania Industrial Corp.* v. *Visking Corp.*, 132 F. 2d 947, 958; *Universal Sewer Pipe Corp.* v. *General Construction Co.*, 42 F. Supp. 132, 134; *American Lecithin Co.* v. *Warfield Co.*, 42 F. Supp. 270, 272.

[14] H. R. 20388, 60th Cong., 1st Sess. (1908); H. R. 11796, 61st Cong., 1st Sess. (1909); H. R. 2930, 62d Cong., 1st Sess. (1911); H. R. 16828, 62d Cong., 2d Sess. (1912); H. R. 23417, as amended, 62d Cong., 2d Sess. (1912); H. R. 1700, 63d Cong., 1st Sess. (1913); H. R. 14865, 63d Cong., 2d Sess. (1914); S. 2783, 70th Cong., 2d Sess. (1928); S. 2491, 77th Cong., 2d Sess. (1942).

[15] Final Report and Recommendations of the Temporary National Economic Committee, Sen. Doc. No. 35, pp. 36–7 (1941), 77th Cong., 1st Sess. See also Preliminary Report Sen. Doc. No. 95, pp. 16–17 (1939), 76th Cong., 1st Sess.

[16] *United States* v. *American Tobacco Co.*, 221 U. S. 106; *United States* v. *Terminal Railroad Association*, 224 U. S. 383; *United States* v. *Great Lakes Towing Co.*, 217 F. 656, appeal dismissed 245 U. S. 675; *United States* v. *New England Fish Exchange*, 258 F. 732; *United States* v. *Pullman Co.*, 50 F. Supp. 123.

Under paragraph 24 (b) a defendant hereafter acquiring a patent cannot set the price for its use by others, elect to use it himself and refuse to license it, or to retain it and neither use nor license it. These are options patent owners have always enjoyed.[17]

Congress was asked as early as 1877, and frequently since, to adopt a system of compulsory licensing of patents.[18] It has failed to enact these proposals into law. It has also rejected the proposal that a patentee found guilty of violation of the antitrust laws should be compelled, as a penalty, to license all his future inventions at reasonable royalties.[19] The Temporary National Economic Committee recommended congressional adoption of such a system,[20] but Congress took no action to that end.

Paragraph 24 (a) of the decree should be modified to permit the reservation of reasonable royalties and its provisions should be restricted to feeders, formers, stackers and lehrs and patents covering these or improvements of them, or methods or processes used in connection with them.

Paragraph 24 (b) should be limited in respect of future applications and resulting patents or patents hereafter acquired by assignment, to those covering feeders, formers, stackers and lehrs, or parts thereof or improvements thereon, and methods and processes involved in their con-

---

[17] *Paper Bag Patent Case*, 210 U. S. 405, 424; *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502, 510, 514; *Crown Die & Tool Co.* v. *Nye Tool & Machine Works*, 261 U. S. 24, 34–35.

[18] H. R. 8776, 62d Cong., 1st Sess. (1911); S. 2116, 62d Cong., 1st Sess. (1911); H. R. 26185, 62d Cong., 2d Sess. (1912); S. 2303, 77th Cong., 2d Sess. (1942); S. 2730, 77th Cong., 2d Sess. (1942); H. R. 1371, 78th Cong., 1st Sess. (1943); cf. S. 300, 45th Cong., 1st Sess. (1877).

[19] S. 2783, 70th Cong., 2d Sess. (1928).

[20] Final Report and Recommendations of the Temporary National Economic Committee, Senate Doc. No. 35, pp. 36–7 (1941), 77th Cong., 1st Sess.

struction and operation. For example, if Ball or Thatcher should procure a patent on a bottle-capping machine or for a composition of glass, there is no reason to compel a license to Hartford or Hazel or anyone else. Other paragraphs of the decree preclude a misuse of the patent in violation of the antitrust laws.

Paragraph 24 (c) should be deleted.

Paragraph 25 restrains all the corporate and individual appellants, whenever regularly engaged in the manufacture of glassware for interstate commerce, from discrimination "by means of wholly exclusive or partially exclusive requirement contracts" "or otherwise" against any such manufacture, present or prospective; or in the filling of orders for machinery on the basis of the size of the order or credit rating of the customer, if he is willing to pay cash, his standing in the industry or otherwise; and from conspiring with any other person or corporation to obstruct or delay the furnishing of any such machinery.

The earlier portion of the paragraph is vague and would be difficult of application. It seems not to be addressed to any practice indulged in or threatened by any of the appellants. It should, therefore, be modified or eliminated. The last five lines of the paragraph are appropriate although the matters covered by them are apparently embraced in other portions of the decree.

Thatcher and Ball insist that no such injunction should be directed to them for the reason that they are not now, and never have been, in the business of owning machinery patents or selling or licensing glassmaking machinery. We think, however, in view of the fact that they have been found to have conspired with Hartford and the other appellants in denying and obstructing competitors from obtaining machinery, the injunction, modified as suggested, may stand against them.

Paragraph 26 enjoins all of the corporate appellants, and all of the individuals associated with them, until the

entry of a finding by the court on the petition of any defendant that the consequences of the conduct of the defendants in violation of the antitrust laws have been fully dissipated, from the following acts: (a) bringing, maintaining, or taking any action in any suit for infringement of any patent owned or controlled or hereafter issued on pending applications covering glassware machinery; (b) attempting to interfere, by suit or otherwise, with the possession of any machinery owned, or claimed to be owned, by any appellant which is in the possession of any licensee except sale to the licensee pursuant to paragraph 21; (c) attempting to collect royalties or license fees for the use of any inventions covered by existing patents or applications for patents for glassware machinery.

Since paragraphs 21 to 24 (a) inclusive are to be eliminated, this paragraph, which is ancillary to them, should also be deleted from the decree, but in view of the nature of the conspiracy found, an injunction should go against the further prosecution of all infringement suits pending at the date this suit was brought. Hartford and the other corporate defendants mentioned in paragraph 24 should be required to lease or license glassmaking machinery of the classes each now manufactures to any who may desire to take licenses (under patents on such machinery or on improvements, methods or processes applicable thereto), at standard royalties and without discrimination or restriction, and if at the time of entry of the decree there are any alleged infringers who are willing to take such licenses they should be released, and the patent owner deprived of all damages and profits which it might have claimed for past infringement. The decree should, however, be without prejudice to the future institution of any suit or suits for asserted infringements against persons refusing to take licenses under any of the presently licensed inventions arising out of their use after the date of the decree. The decree should not forbid any

defendant from seeking recovery for infringement, occurring after the date of the final decree, of patents not covering feeders, formers, stackers, lehrs or processes or methods applicable to any of them.

Paragraph 27 cancels all outstanding agreements between corporate appellants, including all modifications made prior to or pending trial. This is consonant with the terms of the earlier paragraphs which require corporate appellants to license all inventions involved, royalty free, and to sell machines embodying such inventions.

In view of what we have already said about these earlier paragraphs, the license agreements as modified by the parties and in accordance with the views here expressed, should be allowed to stand. As has been noted, these are all at uniform royalties, and all without restrictions or discriminatory features. We do not understand that, as modified, any of these agreements is attacked as containing improper or unlawful provisions. If, however, any of them is found still to embody provisions inconsistent with the form of relief we have outlined, its reformation should be decreed. The appellants should be enjoined from hereafter altering these agreements, or any hereafter made in like terms, without the approval of the court. If the existing royalties are excessive these may be reduced to a fair and reasonable basis. The decree should permit any corporate appellant, acting alone, to lease or sell patented machinery or license the use of patents, if it so elects, provided always that no discrimination be practiced and that no restrictive conditions be attached (except as stated in connection with paragraph 29) save with the approval of the court.

A word should be said with respect to the effect of this paragraph in cancelling the agreement of September 23, 1940, between Hartford-Empire and Corning, and the assignment of three patents to Corning pursuant thereto.

It will be recalled that, prior to the trial, Corning and Hartford cancelled the 1916 and 1922 agreements which the court found illegal and which the decree ordered cancelled notwithstanding the parties' prior action. Further, Corning was given an unrestricted license by Hartford which will require the payment of increased royalties by Corning for use of Hartford's inventions. In consideration of the cancellation of the agreements, Hartford agreed to pay Corning $1,125,000, in installments, and to transfer to Corning three patents owned by Hartford. The decree orders these payments impounded, but makes no disposition of the impounded fund. It also requires Corning to reassign the patents to Hartford.

Two of the patents have expired. The reason for Corning's desire to obtain title to the patents was that two of them were alleged to conflict with certain features of Corning's ribbon machine [21] although the claim was always contested and never established. These are the two expired patents. The third was alleged to infringe upon a feature of a Corning patented machine known as a turret chain machine. Continued ownership of the patent by Hartford would constitute a threat against the use by Corning of the machine. The assigned patent will expire six years before Corning's patent on the turret chain machine. Naturally Corning desired to be free from the possible threat of infringement suits. It does not appear that the ownership of this patent by Corning would tend to perpetuate or create any improper monopoly or patent pool. In any event, Corning has agreed, if such danger is found to exist, to dedicate the patent to the public, since all it desires is to be free of restraint on the part of Hartford in the use of its turret chain machine. Such dedication should be ordered.

---

[21] There is no claim that the ribbon machine patent was ever part of a combination of patents.

In the light of these facts, the settlement made by Hartford and Corning ought not to be set aside nor ought the payment to be made by Hartford to Corning thereunder be enjoined. The money paid into court by Corning should be returned to it.

The paragraph orders cancellation of the agreements of June 30, 1916 between Hartford-Fairmont and Empire, and that of October 26, 1922 between Hartford, Corning and others. These have been cancelled, but the decree should enjoin their reinstatement, or the making of like contracts in the future.

Paragraph 28 orders cancellation of all Hartford machinery leases now outstanding and requires that each lessee be offered a new license (without royalty, pursuant to paragraph 24) and offered the right to purchase all of the machinery now held under lease (as required by paragraph 23). In view of what has been said this provision should not stand.

Paragraph 29 enjoins the insertion or enforcement of any provision in any agreement heretofore or hereafter made by any of the appellants which (a) directly or indirectly limits or restricts (1) the type or kind of product, whether glassware or any other, which can be produced on machines or equipment or by processes embodying inventions licensed under patents or patent applications, (2) the use of the product so produced, (3) the character, weight, color, capacity, or composition of the product, (4) the quantity, (5) the market, either as to territory or customers in or to which the product may be sold or distributed, (6) the price or terms of sale or other disposition of the product, or (7) the use of the machinery or equipment distributed or the inventions licensed in connection with any other machinery or equipment, or the use of it in any specified plant or locality; (b) authorizes termination of the license for unauthorized use; (c) provides that the licensee shall not contest the validity of

any patent or patents of the licensor; (d) provides that improvements by the licensee on machinery leased and sold shall become the property of the lessor; (e) provides that rights to improvements and inventions covering licensed machinery or processes or methods shall become the exclusive property of the lessor or vendor; or (f) grants to any licensee a preferential position by lower rates of royalty, by different provisions of licensing, leasing, or sale, by exclusive licensing, rebate, discounts or requiring a share in net or gross income, or by any other means.

The paragraph now covers every kind of invention and every patent, present or future, in any field if owned or controlled or distributed by an appellant.

The injunction will stop all inventions or acquirement of patents in any field by any appellant unless for its own use in its business, for it sets such limitations upon the reward of a patent as to make it practically worthless except for use by the owner. It is unlimited in time. It is not limited to any joint action or conspiracy violative of the antitrust laws; it covers inventions in every conceivable field.

The Government now agrees that this injunction should be limited to glassmaking machinery and glassware as defined in paragraph 1 of the decree of the District Court.

The corporate appellants have amended, or agreed to amend, existing leases and licenses to remove all such restrictions as are enjoined.[22] We have already said that the decree should enforce conformity of all lease and license agreements to this standard, and forbid the reinstatement or embodiment of any such restrictions in existing

[22] The Government calls attention to findings which show that though Hartford advised certain licensees of the removal of restrictions in their licenses, these licensees have not formally accepted the more liberal terms. Hartford can be enjoined from enforcing the restrictions if that is found necessary.

or future agreements relating to the machinery, methods or processes respecting feeders, formers, stackers or lehrs or involved in their use, covered by patents now owned or applied for or those hereafter acquired by any corporate appellant.

Paragraph 29 should be amended to permit any appellant, corporate or individual, to retain and refuse to license, to use and refuse to license, or to license with restrictions, any patent hereafter applied for or acquired except those applicable to feeders, formers, stackers and lehrs and processes and methods applicable thereto. Its restraints should be limited as we have indicated those of paragraph 24 (b) should be limited.

Paragraph 30 applies all the terms of paragraph 29 to agreements hereafter made between any of the defendants. This should be modified to conform to the alterations to be made in paragraph 29.

Paragraph 31 requires court approval of "any agreement between any of the defendants" and "of any license agreement made pursuant to this judgment." This is too sweeping. The provision is without limit of time and not terminable upon fulfilment of any condition. Many of the individual defendants are employees of one of the corporate defendants. An employment contract could not be made with such an one without court approval. Nor can any defendant enter into the most innocent and usual business transaction with any other, however unrelated to the conspiracy, without similar approval. This paragraph, if retained, should be restricted in application to lease or license agreements and agreements respecting patents and trade practices, production and trade relations.

By paragraph 33 each of the individual defendants is enjoined from "holding, controlling, directly or indirectly, or through corporations, agents, trustees, representatives, or nominees, any of the issued and outstanding capital stock, bonds, or other evidences of indebtedness of more

than one corporation engaged either in the manufacture and sale of glassware or in the manufacture or distribution of machinery used in the manufacture of glassware or in both. . . ." The individual defendants thus enjoined are officers and directors of the corporate defendants. The purpose of dealing with stock ownership is to prevent aggregation of control to the end of establishing a monopoly or stifling competition. The ownership of a few, or even a few hundred, shares of stock of a glass manufacturing company not in competition with the company of which a defendant happens to be a director or officer can have no tendency towards such a result. Many food packers and makers of proprietary articles manufacture part or all of the glassware in which their goods are sold. The decree would require all of the defendants, at their peril, to part with any stock which they own in such a concern and to refrain from buying any. Owens is in the glass container business. It has never manufactured pressed or blown ware or light bulbs, yet the decree would forbid any defendant connected with Owens from investing in any concern manufacturing these articles. It is unnecessary to multiply instances of the broad sweep of the paragraph.

Moreover, the injunction is against ownership of bonds of any such company. It is difficult to see how such ownership in any reasonable amount by any of the individuals in question could tend towards a violation of the Sherman Act. The phrase "evidence of indebtedness" is also used. This would indicate complete prohibition against making a loan however reasonable, or however proper the purpose, evidenced by a promissory note.

The decree should be modified to prohibit acquisition of stocks or bonds of any corporate appellant by any other such appellant, and to prohibit only the acquisition of a measure of control through ownership of stocks or bonds or otherwise, by any individual in a company competing

with that with which he is officially connected or a subsidiary or affiliate of such competing company.

The appellants Falck, Houghton, Houghton Jr. and Levis own substantial amounts of stock of Corning and of Hartford. By the decree they are required to divest themselves of their stock in the one or the other within two years from the date of the judgment. In view of the effect of the decree on Hartford, it may prove difficult for these defendants to comply within the period stated without severe loss. We are of opinion that a longer time should be allowed and that an alternative provision would be appropriate depriving these defendants of the right to vote the stock of one company or the other or to trustee the stock of one of the corporations if both stocks are held longer than the term fixed.

Paragraph 34 which deals with present holdings of individual appellants should be revised to comport with the views expressed as to paragraph 33.

Paragraph 35 enjoins each individual defendant from holding, at the same time, an office or directorship in more than one corporation which manufactures and sells glassware or manufactures or distributes glassmaking machinery. The injunction is not limited to directorships in more than one of the defendant corporations. The same comment applies as has been made with respect to paragraph 33. There may be many instances when the normal freedom to act as a director of more than one company will in no wise conflict with the policies of the antitrust laws or tend to the fostering of practices which those laws forbid. The same considerations apply to paragraph 36–A and 36–B, which should be limited to the acquisition of the business or assets of a competing corporation by a corporate defendant, and by any officer of a corporate defendant, of the business or all the assets of a competing concern, unless the acquisition is approved by the court.

Paragraphs 37 to 39 are directed at the Glass Container Association, its officers, directors, employes and members. The District Court has found that from 1928 to 1937 the association, through the instrumentality of its statistical committee, on which the principal corporate defendants were represented, furnished forecasts of probable future production of each of the glass manufacturers concerned and that these forecasts were communicated at meetings of the association by one manufacturer to another so that there was general knowledge amongst the members of the forecasted future production of each of them. These forecasts, the court found, were treated by the corporate appellants and their officers as in fact quotas, deviation from such quotas was discouraged, and it was the general understanding that each manufacturer should restrict his production to accord with his quota. The court further found that the association, working in close cooperation with Hartford, which was not a member, endeavored to discourage expansion of the industry and to prevent increased competition through the entry of new units into the various fields of manufacture of glass containers.

The court, in its opinion, indicates that it does not find it necessary to dissolve the association and further indicates that it may serve a valuable purpose to the industry "as a statistical and research body" and in the promotion of better methods of manufacture and distribution.

The injunctions entered in paragraphs 37 to 39, inclusive, compel the association to abolish its statistical committee and to refrain from establishing any committee with similar functions; enjoin it from retaining any of its present officers or board of directors who are defendants and also directors, officers or employes of any defendant corporation, and order it to submit to the Attorney General and to the court the names of directors or officers to be elected or appointed to succeed present incumbents. The association is enjoined from electing,

employing, or continuing in office or employment, anyone who is, at the time, an officer, director, agent or employe of the corporate appellants, and is required to amend its charter and by-laws to prevent such employment.

We think the injunction as respects the association, while leaving it in existence, practically destroys its functioning, even as an innocent trade association for what have been held lawful ends.[23] The association has undoubtedly been an important instrument of restraint and monopoly. It may be made such again, and detection and prevention and punishment for such resumption of violations of law may be difficult if not impossible. In the light of the record, we think it better to order its dissolution, and to provide that the corporate defendants be restrained for a period of five years from forming or joining any such trade association, and that thereafter they may apply for leave to do so, and have such leave on showing to the court that the purposes and activities of the proposed body will not be violative of law.

Paragraph 40 is a general injunction against future conduct. It is designed to prevent combinations, in violation of the antitrust statutes. It names each corporate defendant "and the individual defendants associated therewith" meaning the officers and directors of each who are found to have participated in the conspiracy. But an injunction binding the corporate defendants, their officers, agents and employes, is sufficient to constrain the individual defendants so long as they remain in official relation, and to bind their successors. It is unnecessary to enjoin them personally, when that relation is severed.

---

[23] See *Maple Flooring Manufacturers Association* v. *United States*, 268 U. S. 563, 582, 583; *Cement Manufacturers Protective Association* v. *United States*, 268 U. S. 588, 606; *Appalachian Coals* v. *United States*, 288 U. S. 344, 374; *Sugar Institute* v. *United States*, 297 U. S. 553, 598.

Sub-paragraph (1) prohibits combining with any other defendant or with any other manufacturer or "seller" of glassware or glass machinery. The appellants object to the inclusion of the word "seller," claiming that the use of this term may preclude normal business arrangements with agents and consignees. We shall later indicate the proviso we think necessary in this connection. We are of opinion that the sub-paragraph should be amended by exscinding the phrase "its directors, officers, agents, and employees" in both clauses, and inserting the words "whether a natural person, partnership or corporation" after the word "glassware" appearing in the last line of the printed draft of the decree furnished this court by the appellants.

Sub-paragraph (b) should be amended by inserting the word "a" between "of" and "manufacturers" (which should be in the singular) in the first line of the same draft, deleting the words "or effect thereof" in the sixth line and inserting in lieu thereof "of such ascertainment, estimate or forecast" and by inserting in the next line between the words "persuade" and "any" the words "or agree with".

Sub-paragraph (c) should be amended to substitute in the sixth line of the same draft for "or where" the word "with" and for "or effect is" the words "or agreement".

Sub-paragraph (d) should be deleted. The requirement that all trade information be given to the public would render the assembly of it for the information of members useless and indeed detrimental to competition. The inclusion of such a provision in an antitrust decree has been disapproved by this court.

Paragraph (2) should be modified by adding at the end "in the distribution of glassware or machinery for the manufacture of glassware".

Paragraph (3) which deals with distribution of data concerning the business of glassmaking and glass ma-

chinery distribution is approved with these alterations: after the word "otherwise" in the seventh line of the draft there should be inserted the words "pursuant to any agreement or understanding or with the purpose or intent" and there should be deleted the words "in such form or manner as to indicate"; after the word "machinery" in the next to last line, the sentence should read, "shall limit his or its output to any production quota or shall adhere or conform to any price".

In order to permit usual business transactions not related to violations of the antitrust statutes there should be added at the end of paragraph 40 a proviso that nothing in the paragraph is to be construed to forbid normal business transactions of any of the corporate defendants with its selling agents or consignees, persons or corporations rendering services to it, or customers; or to prohibit transactions with citizens or corporations of foreign nations; or to prevent any defendant from availing of the benefits of the Webb-Pomerene Act, the Small Business Mobilization Act or (save as elsewhere in the decree provided) of the benefits of the patent laws.

Paragraphs 41 and 42 are duplications of other provisions of the decree. They should be deleted.

Paragraph 51 enjoins all defendants from directly or indirectly acquiring, otherwise than through direct issue from the patent office, any patent, patent application, or exclusive rights thereunder, covering any invention embodied or employed in a machine or process used, or to be used, in glassware manufacture ("whether or not the machine or process embodying or employing the invention covered by the patent can be used without infringing another patent or patents") which constitutes or employs, in whole or in part, a method, means, or process to obtain results in the glassmaking art which is identical with, similar or alternative to, those obtained or obtainable by the machinery, methods, or processes embody-

ing inventions covered by patents then owned or controlled by any defendant, except non-exclusive rights or patents on inventions of its or his employes or those of a subsidiary, made during the time of employment.

The scope of the provision is not clear. Whether it applies to an improvement upon an existing patented invention seems doubtful. Perhaps it does not prevent an owner of a patent upon a feeder from acquiring one upon a former, or an owner of a patent upon a stacker from acquiring one upon a lehr, but, as the provision is framed, this is not clear. The injunction seems in effect to forbid acquisition by any defendant of any patent right in any glassmaking field, for most of the corporate defendants, and perhaps some of the individuals, now own some such patent.

It is clear, however, that the paragraph enjoins all acquisition of patent rights other than non-exclusive licenses. In this respect, it is the reverse of paragraph 29 which outlaws all grants except unrestricted non-exclusive licenses. It will be noted that the injunction runs against each defendant individually and is not applicable to joint acquisitions or to combinations or agreements respecting acquisition. It seems to prohibit the acquisition of any patent, or of a restricted license under any patent by any defendant. In this respect the paragraph is inappropriate to restrain future violations of the antitrust statutes. The paragraph should be deleted.

Paragraph 52 deals with the problem of suppressed or unworked patents. Much is said in the opinion below, and in the briefs, about the practice of the appellants in applying for patents to "block off" or "fence in" competing inventions. In the cooperative effort of certain of the appellants to obtain dominance in the field of patented glassmaking machinery, many patents were applied for to prevent others from obtaining patents on improvements which might, to some extent, limit the return in the way

of royalty on original or fundamental inventions. The decree should restrain agreements and combinations with this object. But it is another matter to restrain every defendant, for the indefinite future, from attempting to patent improvements of machines or processes previously patented and then owned by such defendant. This paragraph is, in our judgment, too broad. In effect it prohibits several of the corporate defendants from applying for patents covering their own inventions in the art of glassmaking. For reasons elsewhere elaborated it cannot be sustained. It should be limited as we have suggested that paragraphs 24 (b) and 29 be limited. In addition, it enjoins every defendant from applying for a patent "with the intention of not making commercial use of the invention within four years" from issue of the patent and makes the failure commercially to use the invention *prima facie* proof of the absence (*sic*) of such intention.[24] This provision is also legislative rather than remedial. Unless we are to overturn settled principles the paragraph in question must be eliminated.

A patent owner is not in the position of a quasi-trustee for the public or under any obligation to see that the public acquires the free right to use the invention. He has no obligation either to use it or to grant its use to others. If he discloses the invention in his application so that it will come into the public domain at the end of the 17-year period of exclusive right he has fulfilled the only obligation imposed by the statute.[25] This has been settled doctrine

---

[24] The Government suggests that the paragraph should be revised to read: "with the intention of never making commercial use of the inventions covered thereby, provided that failure to make such use within four years from the date of issuance of patents thereon shall be deemed *prima facie* proof of the presence of such intention at the time of the filing or prosecution of such applications."

[25] *United States* v. *Bell Tel. Co.*, 167 U. S. 224, 249; *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.*, 210 U. S. 405, 424, 429, 430.

since at least 1896. Congress has repeatedly been asked, and has refused, to change the statutory policy by imposing a forfeiture [26] or by a provision for compulsory licensing [27] if the patent is not used within a specified time. The governing rule is quoted in *Chapman* v. *Wintroath*, 252 U. S. 126, at 137:

" 'A party seeking a right under the patent statutes may avail himself of all their provisions, and the courts may not deny him the benefit of a single one. These are questions not of natural but of purely statutory right. Congress, instead of fixing seventeen, had the power to fix thirty years as the life of a patent. No court can disregard any statutory provisions in respect to these matters on the ground that in its judgment they are unwise or prejudicial to the interests of the public.' *United States* v. *American Bell Telephone Co.*, 167 U. S. 224, 247."

Paragraph 55 requires submission to certain investigations by the Department of Justice and the furnishing of information with respect to the business of the corporate defendants in the future. It should be modified to accord with our opinion in *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, which involved a similar provision.

A word should be said concerning the inclusion in many paragraphs of the decree, and in many of the injunctions imposed, of various individual defendants who in the past have acted as, and who at present are, officers or directors of the corporate defendants. They offended against

---

[26] H. R. 13876, 62d Cong., 1st Sess. (1911); H. R. 22203, 62d Cong., 2d Sess. (1912); S. 3297, 67th Cong., 2d Sess. (1922); H. R. 6864, 75th Cong., 1st Sess. (1937).

[27] S. 3325, 67th Cong., 2d Sess. (1922); S. 3474, 69th Cong., 1st Sess. (1926); S. 705, 70th Cong., 1st Sess. (1927); S. 203, 71st Cong., 1st Sess. (1929); S. 22, 72d Cong., 1st Sess. (1931); S. 290, 73d Cong., 1st Sess. (1933); S. 383, 74th Cong., 1st Sess. (1935); S. 2491, 77th Cong., 2d Sess. (1942).

the antitrust laws by acting on behalf of, or in the name of, a corporate defendant. There are no findings, and we assume there is no evidence, that any of them have applied for, owned, dealt in, and licensed patents appertaining to the glassware art. Nor is there evidence or finding that, as individuals acting for their own account, any of them, as a principal, has entered into any of the arrangements found unlawful by the court. Despite these facts, in practically every instance where a corporate defendant is restrained from described action or conduct, these individuals, as individuals, are likewise restrained. Any injunction addressed to a corporate defendant may, as various sections of the decree do, include its officers and agents. If the individual defendants are officers or agents they will be comprehended as such by the terms of the injunction. If any of them cease to be such, no reason is apparent why he may not proceed, like other individuals, to prosecute whatever lawful business he chooses free of the restraint of an injunction. On the other hand, if new officers and directors take the places of these defendants, such new agents will automatically come under the terms of the injunction. There is no apparent necessity for including them individually in each paragraph of the decree which is applicable to the corporate defendants whose agreements and cooperation constitute the gravamen of the complaint. That these individuals may have rendered themselves liable to prosecution [28] by virtue of the provisions of § 14 of the Clayton Act [29] is beside the point,

---

[28] *United States* v. *Socony-Vacuum Oil Co.,* 23 F. Supp. 937, affirmed 310 U. S. 150.

[29] 38 Stat. 736; 15 U. S. C. § 24. "That whenever a corporation shall violate any of the penal provisions of the antitrust laws, such violation shall be deemed to be also that of the individual directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts constituting in whole or in part such violation, and such violation shall be deemed a misdemeanor . . ."

since relief in equity is remedial, not penal. These considerations, however, do not apply to the provisions of paragraphs 3 to 7 and 33 to 35 inclusive, as the same are to be modified.

Paragraph 42 requires Ball to cancel certain agreements with the Knox Glass Bottle Company and Underwood, and with Brockway Machine Bottle Company and Robert L. Warren, which excluded the parties named from entering the glass container business for periods of years. As it appears without contradiction that these restrictions have already been released by Ball, the paragraph seems unnecessary.

The judgment of the District Court is reversed as to the appellants in Nos. 10 and 11; its decision that the appellants in the other appeals have violated the antitrust laws and should be enjoined from future similar violations is affirmed, but the decree entered is vacated and the cause is remanded for further proceedings in conformity to this opinion.

MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting in part.

I agree with the Court's judgment insofar as it sustains the decree of the District Judge.

I cannot, however, agree to many of the modifications of that decree. These appellants have violated the antitrust laws. The District Court's decree, taken as a whole, is an effective remedy, admirably suited to neutralize the consequences of such violations, to guard against repetition of similar illegal activities, and to dissipate the unlawful aggregate of economic power which arose out of, and fed upon, monopolization and restraints. *United States* v. *Crescent Amusement Co.*, 323 U. S. 173. Many

of this Court's modifications seriously impair the decree and frustrate its purposes.

It would probably serve no useful purpose to state at length the reasons which justify the District Court's decree, since they are set forth clearly and well in its opinion. In particular, however, it is my belief that any reasonable assurance that these appellants will not continue to violate the anti-trust law requires that we leave intact the District Court's decree insofar as it (1) provides for appointment of a receiver and the impounding of Hartford's royalties (Paragraphs 10–20 of the Decree); (2) requires that glassware machines should be disposed of by outright sale rather than by leases (Paragraphs 21, 22, 23); (3) requires that patents, already owned, be licensed royalty free; (4) prohibits the restrictive licensing practices which the appellants so effectively used to create and maintain their monopoly (Paragraph 29); (5) enjoins the appellants from the practice of obtaining patents for the purpose of "fencing in" and "blocking off" new inventions, (Paragraph 52).

The District Court's opinion in my judgment laid a careful and well-reasoned foundation establishing the necessity for every one of these Paragraphs. It would be difficult to add to what the court there said. It is sufficient for me to say only a few words.

The District Court found that these defendants started out in 1916 to acquire a monopoly on a large segment of the glass industry. Their efforts were rewarded by complete success. They have become absolute masters of that domain of our public economy. They achieved this result largely through the manipulation of patents and licensing agreements. They obtained patents for the express purpose of furthering their monopoly. They utilized various types of restrictions in connection with leasing those patents so as to retain their dominance in that industry. The history of this country has perhaps never witnessed a more completely successful economic tyranny

over any field of industry than that accomplished by these appellants. They planned their monopolistic program on the basis of getting and keeping and using patents, which they dedicated to the destruction of free competition in the glass container industry. Their declared object was "To block the development of machines which might be constructed by others . . ." and "To secure patents on possible improvements of competing machines, so as to 'fence in' those and prevent their reaching an improved state." These patents were the major weapons in the campaign to subjugate the industry; they were also the fruits of appellants' victory. The restoration of competition in the glass container industry demands that appellants be deprived of these weapons. The most effective way to accomplish this end is to require, as the District Court did, that these patents be licensed royalty free.

The decree of the court below was well fashioned to prevent a continuation of appellants' monopolistic practices. The decree as modified leaves them free, in a large measure, to continue to follow the competition-destroying methods by which they achieved control of the industry. In fact, they have received much milder treatment from this Court than they anticipated. This is shown by a memorandum of one of Hartford's officers made in 1925. That memorandum which discussed plans for suppression of a number of competitors, with particular reference to possible prosecutions under the Sherman Act, read in part as follows:

"Of course, the court might order that we transfer the entire Federal licensing business to some other party and turn over to that party the Federal patents. This, of course, would simply restore to a certain extent the existing situation and establish a competitor. . . . I . . . do not see much danger of having any of these deals upset. . . . If they are upset, I still believe that by that time, we will be in a better position even with such dissolution than we would be otherwise; and I see no danger whatso-

ever of any criminal liability because the cases are necessarily so doubtful in the matter of law that they could never get any jury to convict and I doubt if any prosecuting officer would ever attempt any criminal action. Criminal action in cases of this sort, so far, has practically been nonexistent."

I would sustain the decree of the District Court, for the reasons it gave, in all of the paragraphs mentioned.

MR. JUSTICE RUTLEDGE, dissenting in part.

With MR. JUSTICE BLACK, in whose opinion I join, I concur in the Court's judgment to the extent that it sustains the District Court's findings and decree. But, with two exceptions, I dissent from the more important revisions made in the decree.

In anti-trust injunction suits the court's function is twofold, to determine liability and to fashion the remedy to fit the fault. Perhaps in some cases the two things may be treated substantially independently. More often they are so interwoven that separation becomes impossible, if other than warped justice is done. This case is of the latter sort. But the Court's modifications largely disregard this fact.

The story involves a quarter of a century of Sherman Act violation.[1] Necessarily it has been sketched here only in outline. The bare bones of the history show, as rarely has been done, the combination's expanding scope, the corresponding growth of design, the varied, but often devious and ruthless methods, as well as the ultimate total

---

[1] The District Court found ". . . that there has not only been a violation of the anti-trust laws, beginning with the first agreement between Hartford and Empire in 1916, but I am convinced that this violation of the laws was as deliberate as any that I can find in a review of anti-trust cases." 46 F. Supp. 541, 552–553. Hartford and Lynch were also found guilty of contracting in violation of the Clayton Act.

success of this long adventure in monopoly and unlawful restraint of trade.[2] Without the color supplied by detail, however, the excursion's true character is hardly half revealed. The full effect cannot now be given. It appears in the District Court's careful and restrained opinion, 46 F. Supp. 541, buttressed in every conclusion, nearly every page, from writings accumulated, while the combination grew, in the files of the principal participants,[3] and in other published documents.[4]

[2] Sixteen pages of the trial court's opinion are given to a summary of manifestations of conscious guilt. The instance cited in the opinion of Mr. Justice Black is illustrative. See also text *infra* at note 10. The methods employed ranged from suggestions for "cooperation" to the division of fields within the industry and the squeeze-out of rivals, ruthlessly and constantly through the system of licensing and leasing which the court found was "the greatest abuse." Cf. text *infra* at note 15. Hazel-Atlas was a hold-out until the "three-way partnership" agreement of 1932. The long story showing how that company finally was brought "within the family" is particularly interesting in disclosing the methods used in bringing a rival to book.

[3] Characterizing the case as "primarily documentary," though also noting the "reticence of some of the key witnesses to disclose what plainly was within their knowledge as principal actors in the main conferences that occurred over a period of time," the court stated: ". . . in this case, the men who planned and directed the proceedings under scrutiny, from 1916 down to the time of the filing of the complaint herein, left behind them numerous exchanges of letters and many memoranda executed contemporaneously with the happening of the main events and designed for the information of their contemporaries, their boards of directors, or for their successors in office. It is hard to imagine a case in which a court would have more first-hand information of what the parties did and intended than in the case at bar." (P. 553.)

[4] See the reports of the Temporary National Economic Committee, the disclosures of which were largely responsible for the institution of this proceeding. Investigation of Concentration of Economic Power, Sen. Doc. No. 95, 76th Cong., 1st Sess. (1939); *ibid.*, Sen. Doc. No. 35, 77th Cong., 1st Sess. (1941); *ibid.*, Monograph No. 31, Hamilton, Patents and Free Enterprise, 76th Cong., 3d Sess., Senate Committee Print (1941).

This emphasis upon the complete picture, in color and detail, is pertinent to liability. It bears even more directly on the quantity and character of relief required to uproot the combination's destructive and unlawful effects. Without this view, many of the decree's provisions, cast in dry legal terms, denuded of the life and history which brought them forth, seem drastic. With it, they take a wholly different aspect.

One may start, with the Court, upon the basic idea that, in such a proceeding, the decree's function is not to impose sheer "punishment" for past misconduct, but is rather to devise effective measures to prevent its repetition and dissipate its consequences. This does not mean, however, that there is any clear, sharp line which can be drawn on the crux of past and future between punishment and prevention or dissipation; or that this difference should be translated into the implicit assumptions which seem to underlie the Court's extensive revisions of the decree and thereby strip it in great part of effectiveness. The assumptions relate to the respective functions of trial and appellate courts in framing the decree as well as to the criteria by which are to be gauged the quantity and quality of relief needed to be effective.

It seems to be implied from the number, character and detail of the revisions that it is the business of this Court to rewrite the decree, substituting its own judgment for that of the District Court when there is difference concerning the wisdom or need of a particular revision. A supporting notion, apparently, is that the "equity" procedure to enforce the Act is hedged with the same limitations non-statutory equity has placed about its action as a system of private remedial litigation. Both these ideas have backing in a third misconception, that men who have misused their property, and acquired much of it, by violating the Sherman Act, are free for the future to continue using it as are other owners who have committed no such

offense; and that consequently the appropriate relief affecting such use is the least restriction which possibly will prevent repetition of past violations. Cf., however, *United States* v. *Union Pacific R. Co.*, 226 U. S. 470, 477. Except upon these assumptions, the Court's major revisions of the decree cannot be justified.

Shortly, in my view it is not this Court's business to fashion or rewrite the decree. Where the trial court, with obvious care and judgment, has devised measures it deems essential to protect the public interest and we agree they may be sufficient, our modifications by watering them down should stop with directions to eliminate provisions contrary to law or those we can say amount to an abuse of discretion. *United States* v. *Crescent Amusement Co.*, 323 U. S. 173, 185. Changes imposing greater restrictions should be made only when the decree is insufficient to accomplish the protection required. *Ibid.* The reasons which thus ordinarily restrict the scope of appellate review have magnified force in anti-trust proceedings. Their complex character usually requires, as in this case, months or years for the trial court's consideration. With its maximum attention, this Court cannot possibly attain the same detailed familiarity with the cause. Nor can it frame at long distance, with the same assurance, a decree adequate for the necessity.

The so-called equitable character of the proceeding does not nullify this inherent limitation upon appellate judicial action. Nor does it justify an attitude which would circumscribe the suit or the relief with the limitations courts of equity traditionally have put around their action in private litigation. The anti-trust injunction suit is in form "a proceeding in equity." In substance, it is a public prosecution, with civil rather than criminal sanctions, for vindication of public right and for redress and prevention of public injury. To regard the fashioning of appropriate relief in such a suit as identical with the same

function in private litigation is to disregard at once the former's statutory origin, its public character, and the public interest it protects. The equitable garb of the proceeding therefore does not determine or conceal its true character. Nor does it limit the required relief merely to what will prevent repetition of the illegal conduct by which the combination has been formed, its property acquired, and its dominating position secured.

The contrary view ignores the momentum inherent in such a combination. The power, and much of the property, now aggregated in the combination's hands and those of its principal participants, was gathered by unlawful methods, at the expense of the public and competitors.[5] Presumably neither power nor property could have been accumulated by lawful means. Nor can they now together be transferred legally to another. The loosened restrictions of this Court's revision may be sufficient to prevent, for the future, further acts of the character and having the effects of the past violations. But the pool has acquired more than 800 patents, which control the industry, of which Hartford alone holds more than 600. Its members, including Hartford, are not compelled to disgorge any of these, or prohibited to acquire others.

---

[5] Referring to the defendants' argument "that the price of glassware to the consumer has not increased," the District Court's opinion stated (p. 620): "But again this is not a good defense if there have been violations of the law. Moreover, the history of the case shows the great extent to which automatic machinery has come into use within the past forty years. It is natural to assume that the cost of production would decrease with the great influx of automatic machinery. Evidently the defendants managed to retain this saving in the cost of production by means of the conspiracy herein, which is manifested by the large profits in the industry. The benefits certainly were not passed on to the public." Previously the court had found that, "Dominance over the entire industry is today so complete that at any time within the choice of Hartford and Owens prices to the consumer of glassware may arbitrarily be raised beyond all reason." (P. 619.)

Many of the patents, and certainly the cherished "patent position," [6] were secured only by virtue of the illegal conduct. Whatever benefits may flow from these patents and the patent position thus created are inevitably the consequences of that conduct.[7] Merely to throw off the illegal practices, such as restricted and discriminatory licensing, cannot reach those consequences. Every dollar hereafter, as well as heretofore, secured from licenses on the patents illegally aggregated in the combination's hands is money to which the participants are not entitled by virtue of the patent laws or others. It is the immediate product of the conspiracy. To permit these patents to remain in the guilty hands, as sources of continuing lucrative revenue, not only does not deprive their owners of the fruit of their misconduct. Rather it secures to them its continued benefits. The pool may no longer utilize illegal methods. It, and the constituent members, will continue to enjoy the preferred competitive position

---

[6] Illustrative of the combination's purpose in this respect is Levis' report to Owens' board of directors in November, 1929: "Our negotiations with Hartford-Empire Company and others, so far as our patent situation and royalty income is [sic] concerned, should be to attempt to secure a position whereby we pay no royalty on any item we produce and we attempt to have all others pay royalty on every item they produce, we participating with any one else in the royalties they receive."

[7] With reference to the contention that the amendments made by the defendants in their contract relations, without the court's knowledge, between the filing of the complaint in 1939 and the closing of testimony over two years later, the court said: "Men cannot, by illegal means, erect an illegal structure—a structure of dominance and control over an industry vital to the welfare of the public—and then, by destroying the illegal means by which the structure has been erected, take the position that they have reformed, that they have adopted a new course of conduct, and that they should go on their way unmolested by the law—as long as the illegal structure and its adverse effects upon the public remain." (P. 618.)

which their conduct has given them and to use both that position and the ill-gotten patents, together with the patent position, to derive trade advantage over rivals and gain from the public which the patent laws of themselves never contemplated and the anti-trust laws, in my opinion, forbid.[8]

These considerations were before the District Court's mind when it devised the decree. Concluding its opinion, that court made a "statement of the principles to be followed" in framing the decree which throws light particularly upon its considered views of the relief required. It stated, with undisputed evidence[9] to sustain its conclusion:

"The court believes that no half-way measures will suffice. There has been a deliberate violation of the law, and it is the duty of the court to do what he can to make certain that these violations of the law will cease and will not be resumed in the future and that competition will be restored in the industry. The record discloses that some of the individual defendants anticipated legal action by the Government, and went ahead in spite of that and violated the law. They also tried to anticipate the remedies that might be applied and did what they could to forestall the effect of such remedies and retain the bene-

---

[8] Cf. notes 13 and 17 *infra*.

[9] Throughout the litigation the facts have been substantially undisputed in consequence of the documentary and conclusive character of the proofs. Cf. note 3 *supra*. The dispute has been primarily over the inferences to be drawn from the facts, the defendants contending, in the words of the District Court (p. 615), that "any control that may exist over the production and marketing of unpatented glassware is but the result of a normal exercise of the patent privilege," with like contention, of course, concerning the production and licensing of glassmaking machinery. The contention merely poses the basic question of law in the case.

fits of their unlawful actions. The court intends to make certain that this does not occur." [10]  (P. 620.)

The Government had requested the dissolution of Hartford, keystone of the combination.[11]  In view of controlling authorities relating to violations not less extensive or more clearly proved,[12] it hardly could be said, and this Court's opinion does not say, that if dissolution of Hartford had been ordered, this would have constituted an abuse of discretion. The District Court did not deny that remedy. Rather it reserved the question for later determination, undertaking meanwhile a milder remedy. In its own words, referring to the Government's request for dissolution, the opinion stated:

"The court, however, is *first* going to make an attempt to avoid that, *if it is possible to do so* and at the same time restore competition to the industry. *If this cannot be worked out* to the satisfaction of the court, *dissolution will be ordered.*" (Emphasis added.)

"The first step to be taken is the immediate appointment of a receiver or receivers of Hartford. The court is going to deny any stay from the appointment of such receivers. It is believed to be absolutely necessary that the receivers take over the management of Hartford forthwith." (P. 620.)

Among the reasons assigned for this action were, first, important changes made by Hartford without the court's

---

[10] Cf. notes 2 and 13.

[11] Unless, in fact, this were Corning, which since 1922 has owned, or controlled, 43 per cent of Hartford's stock. According to the District Court, Corning "in practical effect had sufficient control over Hartford to dictate the policies of Hartford in accordance with Corning's wishes." (P. 557.)

[12] *Standard Oil Co.* v. *United States,* 221 U. S. 1; *United States* v. *American Tobacco Co.,* 221 U. S. 106.

knowledge during pendency of the suit, involving heavy financial obligations of Hartford "for the advancement of the interests of the companies involved," including the transfer of three important patents to Corning which the court felt was "for the obvious purpose of continuing Corning's monopolies regardless of the outcome of this suit";[13] second, to prevent any further abuse of the patent privileges of Hartford and any further violation of the law, since "under the circumstances disclosed by the evidence, the court feels that this can only be done through court officers"; and, third, to conserve the assets of Hartford and preserve the status quo. Pending appeal, therefore, and final determination of the cause, the receivers were directed to take over Hartford's management, continue operation under its existing contracts and agreements for licensing and for leasing its machines, and to receive, set aside and earmark the funds received from licensees, holding them for return to the licensees if the court's decree should be affirmed. Finally, the receivers were to remain in control "until the court is satisfied that the abuses and violations of the law have ceased, until the orders of the court have been carried out, and until the court is satisfied that there no longer remains a reasonable probability that these practices will be resumed. If, after the expiration of a reasonable time, it appears

---

[13] The trial court's conclusions concerning these changes, cf. text *infra* at note 14, may be considered in the light of the other evidence showing consciousness of violation, with anticipation of remedial action, cf. note 2 *supra*, and of practices by which domination obtained under patents was maintained after they had expired, e. g., Hartford's refusal to license others than Corning to make heat-resistant ware and oven ware on its feeders after Corning's patents on glass composition for these wares had expired in 1936. (P. 556.) Cf. also Owens' continued domination of the suction field, noted in this Court's opinion, by use of improvement patents after its basic patent had expired.

to the court that the steps he is now taking are insufficient to restore a free and competitive status to the industry, the receivers shall be ordered to submit a plan or plans for the dissolution of Hartford." (P. 621.)

From this portion of the opinion it is perfectly clear that the District Court has made no final decision concerning the dissolution of Hartford, as it was and still is entitled to do; and that it regarded the receivership as a necessary alternative to granting that relief at once. No other conclusion can be drawn than that the court, if compelled to choose between dissolution and permitting Hartford then to continue under its own management, unhesitatingly would have decreed its dissolution. The court in so many words stated, with reasons to support its view, that Hartford's management could not be trusted to carry out the terms of its decree, to refrain from further patent abuses and violations of the law, but on the contrary already had taken steps to circumvent, in part, whatever remedy might be imposed.[14]

Receiverships generally are to be avoided, if possible. But there are times when they remain essential. If in any circumstances they are so, it would seem to be in these. Yet this Court's judgment directing termination declares, in the face of the District Court's findings and the evidence which clearly sustains them, that the receivership, though useful to preserve the status quo pending decision here, was "not necessary to the prescription of appropriate relief" and should be wound up, and that the business should be returned to Hartford. This is not merely a decision that the receivership was not justified "in the light of what is hereafter said as to the substantive provisions of the decree." It is a substitution of this Court's judgment for that of the District Court on the

[14] Cf. note 13 *supra*.

question of dissolution of Hartford, which it reserved, foreclosing it from decision. It is likewise a substitution of this Court's judgment for that of the District Court on the question whether "the abuses and violations of the law have ceased," also reserved for future decision, and whether the management of Hartford, in the face of the evidence and the findings, can be trusted now to carry out the terms of the decree or were worthy of that trust when the decree was entered. All this, in advance of determination of the facts, which this Court cannot ascertain, on which the decision of these questions must turn.

Such an invasion of the trial court's function, it seems to me, perverts both that function and our own. If that court's findings, justifying the receivership and the reservation of decision on dissolution, were contrary to the law or the evidence, that should be demonstrated and declared. If they constituted an abuse of judicial discretion, the nature and character of the abuse should be pointed out. If they were neither, this Court goes beyond its province by substituting its own long-distance judgment for the immediately informed view of the District Court and in precluding it from judgment, upon issues rightly to be determined by it, in the first instance, whatever the standard which governs review, and in the circumstances rightly reserved by it for future decision. The action of the District Court in appointing receivers should be affirmed and, upon remand of the cause, its power should be unfettered to retain them pending its finding of the conditions specified in its opinion and decree for restoring the business of its owners or, in the alternative, to decree dissolution of Hartford, within a reasonable time.

This Court's more important revisions of the "permanent steps" taken by the District Court may be noticed shortly. The latter's opinion declared (p. 621): "The

most important question is with respect to the licensing and lease system now used by Hartford. The court believes that this is the greatest abuse. It is through the licensing and lease system that Hartford retains control over and dominates the industry." [15] The court stated its view that "there will be further abuses in the future as long as there is a semblance of that system remaining. It is the opinion of the court that this entire system must be abolished." Accordingly it required for future distribution "outright sale at reasonable prices" in place of the leasing of machines, with that method's obvious danger of repossession in case the lessee should fail to observe practices established by the lessors, tacitly or otherwise. The court also required the licensing, royalty free, of existing patents upon glassmaking machinery.

In my opinion both measures were fully justified by the findings and the evidence. The leasing of patented machinery or instruments lends itself particularly to the creation and maintenance of monopoly and to the extension of monopolistic effects far beyond the life and scope of the controlling patent or patents. [16] The holder of a patent who observes the law is entitled to exercise his rights of ownership through lease as well as sale. When, however, he uses his patent right, by the device of leasing, to acquire a monopolistic position stronger than the patent allows, and on being called to halt is not compelled to dispose of the patent, he subjects himself to whatever

---

[15] Cf. note 2 *supra*.

[16] Cf. the statement, in 1922, of V. M. Dorsey to A. D. Falck, of Corning: "F. G. Smith, in private, suggested to me the most revolutionary theory, which he will no doubt talk to you about, viz., putting out the feeders very much like telephones are installed, that is, with an installation charge with a flat royalty plus royalties on production above a given amount. I think it has much to be commended. It would certainly put the pirates out of business quickly."

measures are required to prevent continuance of the practice in the future and to uproot the illegal position and advantage he thus obtains. In my opinion the District Court's finding that further abuses would continue, especially in view of the dangers inherent in the right of repossession, justified its prohibition of the further use of the leasing system.

The requirement of licensing of existing patents, royalty free, would present greater difficulty if the violation had not been so gross and so long continued. But because it was both, and because the evidence shows a long course of using patents and patent position illegally to acquire other patents and consolidate still stronger positions, it is impossible now to determine what patents members of the combination may have acquired illegally. The certainty is, however, that many were so acquired.[17] Since the pool and its members are not required to dispose of the patents, any revenues now received by them from the existing patents are the result, and inevitably will continue to be the result, of the owners' violation of the law. To permit the continued collection of royalties would be to perpetuate, for the lives of the patents, the illegal consequences of the violations. That the court is bound, in equity, and by the statute, not to do.

It is said, however, that the Government has not asked, in this suit, for cancellation of the existing patents and that this provision of the decree amounts to that. The defendants, it is true, cannot derive royalties from them under the terms of the decree, if they continue to distribute machinery and glassware in interstate commerce. If this is drastic, it is because the violation was drastic and there is no other way now, short of dissolution or cancellation,

---

[17] Cf. note 7 *supra*, and the instances cited from Exhibit 76 in the District Court's opinion, 46 F. Supp. 541, 604–606, which caused it to raise the question why criminal prosecution had not been instituted.

to cut off its continuing effects of disadvantage to the public and the industry or of benefit to the violators. The court, seeking to avoid dissolution, had the duty to apply a remedy equally adequate. *United States* v. *Terminal Railroad Association*, 224 U. S. 383, 409. It could not do this, if the pool were left a continuing source of revenue to the violators and of burden to the public. Accordingly it required the agreement for license, royalty free. Since cancellation was not required in terms, it does not follow merely from the royalty free provision that the effect will be the same or that the defendants will not have the benefit of other incidents of ownership which may be exercised without perpetuating the unlawful consequences of the past misuse, such as realizing the value of the patents by sale, made upon proper application with the court's approval.[18]

This Court's revisions of the decree in these respects load upon the industry and the consuming public continuing charges in favor of those who have violated both the anti-trust statutes and the patent laws, a burden which will not end until the last of the illegally aggregated patents has expired, if then. They both foreclose dissolution and forbid the only other remedies equally adequate. So to perpetuate the unlawful consequences of violation will not discourage, it can only encourage setting the law at naught.

From what has been said it follows, of course, that the court properly impounded Hartford's revenues from leasing and licensing arrangements and that these should now be returned to the sources whence received. Again,

---

[18] Even a disposition so guarded would realize for the owner the fruit of his wrongdoing in the case of patents illegally acquired and integrated in the pool. But it would terminate the continuing benefit to him and the possibility of his further misusing the patent to the public harm.

contrary to the Court's implicit assumption, the mere fact that during this period there were no new violations does not mean there were not continuing effects of former ones.

The modifications made in paragraph 29, relating to restrictive licensing, should not go beyond restricting the paragraph to glass products and glass machinery, as the Government now concedes should be done. The provisions of the decree concerning the "fencing" and "blocking" of patents should stand, in view of the proven abuses in applying for patents merely to prevent others from obtaining them. Other revisions are too numerous to mention specifically, except two. I concur in the elimination of the individual defendants, Collins, Fulton, Fisher, and Dilworth, from the restrictions of the decree, for the reasons stated in the Court's opinion. I concur also in the modification which requires the dissolution of the Glass Container Association, since the terms of the decree substantially accomplish this and the District Court expressly found the association had been "a breeding place for many of the illegal practices established herein."

The case presents again the fundamental problem of accommodating the provisions of the patent laws to those of the anti-trust statutes. Basically these are opposed in policy, the one granting rights of monopoly, the other forbidding monopolistic activities. The patent legislation presents a special case, the anti-trust legislation the nation's general policy. Whether the one or the other is wise is not for us to determine. But their accommodation is one we must make, within the limits allowed to the judicial function, when the issue is presented.

The general policy has been to restrict the right of the patent-holder rigidly within the terms of his grant and, when he overreaches its boundary, to deny him the usual protections of the holder of property. That this ordi-

narily has been done in infringement suits[19] or suits for cancellation does not qualify the fact or the policy. On the other hand, the anti-trust statutes have received a broad construction and corresponding enforcement, where violation has been clearly shown. When the patent-holder so far overreaches his privilege as to intrude upon the rights of others and the public protected by the anti-trust legislation, and does this in such a way that he cannot further exercise the privilege without also trespassing upon the rights thus protected, either his right or the other person's, and the public right, must give way. It is wholly incongruous in such circumstances to say that the privilege of the trespasser shall be preserved and the rights of all others which he has transgressed shall continue to give way to the consequences of his wrongdoing.

This is substantially what the defendants have sought in this proceeding and this Court's revision of the decree has granted in large measure. So inverted an idea of equity, or of the law, cannot stand. In a machine age, dominated so widely by patents, the effect can be no other than largely to nullify the anti-trust laws. There may be instances in which a patent holder, guilty of violating those statutes, can so separate his violation and its continuing effects from further full exercise of his patent right that he may become entitled to a form of relief which will permit this. Unless we are to disregard entirely the findings and conclusions of the District Court, supported by overwhelming evidence, this is not such a case.

The Court's major modifications, in my opinion, emasculate the decree.

Mr. Justice Black joins in this dissent.

---

[19] Cf. *Morton Salt Co.* v. *Suppiger Co.*, 314 U. S. 488; *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661.